# CIRCUIT COURT U. S.

## KENTUCKY DISTRICT, NOV. 8th, 1806.

United States
v.
Aaron Burr.
} MISDEMEANOR.

Present—Honourable *H. Innes*, Judge.

The Attorney for the United States, on the 3d day of this term, having made a motion for the caption and examination of the said Burr, &c.

The court this day delivered the following opinion, which is ordered to be entered of record, to wit:

*Discretion of the court to award process upon motions.*

The motion made by Mr. Attorney on the third day of this term is predicated upon the 5th section of the act of congress, entitled an act in addition to the act for the punishment of certain crimes against the United States. "That if any person shall within the territory or jurisdiction of the United States, begin or set on foot, or provide or prepare the means for any military expedition or enterprise, to be carried on from thence against the territory or dominions of any foreign prince or state, with whom the United States are at peace ; every such person so offending, shall, upon conviction be adjudged guilty of a high misdemeanor, and shall suffer fine and imprisonment at the discretion of the court in which the conviction shall be had, so as that such fine shall not exceed three thousand dollars, nor the term of imprisonment be more than three years."

The evidence in support of the motion, is in the following words, viz. J. H. Daviess, attorney for the said United States, in and for said district, upon his corporal oath, doth depose and say, that the deponent is informed, and doth verily believe, that a certain Aaron Burr, Esq., late Vice President of the said United States, for several months past, hath been, and is now, engaged in preparing and setting on foot, and in providing and preparing the means

KENTUC'Y,
Nov. 1806.

United States
v.
Burr.

for a military expedition and enterprise, within this district, for the purpose of descending the Ohio and Mississippi therewith, and making war upon the subjects of the King of Spain, who are now in a state of peace with the people of the United States, to wit, on the province of Mexico, on the westwardly side of Louisiana, which appertain and belong to the king of Spain, an European prince, with whom the United States are at peace.

And said deponent farther saith, that he is informed and fully believes, that the above charge can and will be fully substantiated by evidence, provided this honourable court will grant compulsory process to bring in witnesses to testify thereto.

And this deponent farther saith, that he is informed, and verily believes, that the agents and emissaries of the said Burr, have purchased up, and are continuing to purchase large stores of provisions, as if for an army, while the said Burr seems to conceal in great mystery from the people at large, his purposes and projects ; and while the minds of the good people of this district seem agitated with the current rumour, that a military expedition against some neighbouring power is preparing by the said Aaron Burr.

Wherefore, said attorney, on behalf of said United States, prays that due process issue to compel the personal appearance of the said Aaron Burr in this court, and also of such witnesses as may be necessary in behalf of the said United States; and that this honourable court will duly recognize the said Aaron Burr, to answer such charge as may be preferred against him in the premises. And in the meantime, that he desist and refrain from all farther preparation and proceeding in the said armament within the said United States, or the territories or dependencies thereof.

J. H. Daviess, A. U. S.

*Affirmed to in open court.*

(Attest.) T. Tunstall, C. K. D. C.

*Nov. 5th*, 1806.

The question to be considered :—Has this court power to award process against the accused, and to compel the attendance of witnesses upon this motion ; and if the

court has such power, is the evidence adduced sufficient to warrant the measure?

Four kinds of proceeding have been known and pursued in order to convict persons of crimes and misdemeanors:

1st. By an application to a justice or judge out of court.

2d. By preferring an indictment to a grand jury.

3d. By a presentment of the grand jury. And the

4th. By information.

The present application is not embraced by either of those modes of proceeding. It is a new case resting on the discretion of the court; and as this decision may be considered a precedent in future, I have thought it my duty to take time and mature the subject; because the proposed measure being prevention, no injury could arise by a little delay.

No instance has occurred (within my recollection, since I have become acquainted with judicial proceedings, when a crime or misdemeanor has been committed,) of a motion being made to a court to award process to arrest the offender in the first instance; neither have I knowledge of the existence of a law to authorize it.

In any case where a court awards process, it is predicated upon some previous act already done, which gives the court cognizance of the subject, and brings the case in a legal shape before that tribunal: this being performed, the power to adopt every necessary measure to attain the object and end of the law, and to perfect justice, is vested in a court.

The magnitude of this cause, not only as it relates to the community, but to the accused, requires that the proceeding be pursued with regularity, caution, and circumspection. If the facts stated in the affidavit be true, the project ought to be prevented, and the offender punished. Yet, in doing this, the regular legal steps, pointed out by usage, or by law, ought to be pursued. If, on the other hand, the accused be innocent, the strong arm of power ought to be confined within its proper limits, the known rules of proceeding: and on no occasion but extreme necessity, ought a judge to be induced to exercise a power which rests on discretion. The law then becomes unknown, and the best judge may be considered

KENTUC'Y,  a tyrant, because it then depends upon his whim, and his
Nov. 1806.  caprice.  It will not be uniform, but it is liable to change
                with the opinion of every judge.
United States      These reflections extend to the general principle arising
v.          out of the case.  Admit, however, that they are erroneous ;
Burr.      to award process, would be improper ; it would be an act
of oppression, because there is not legal evidence before
the court to authorize an arrest of the person accused.
The evidence is the oath of a person who has been in-
formed by one not upon oath ; and the deponent believes
the fact to be true.  I make no doubt of the truth of the
affidavit ; that is, that the deponent has been informed
that the fact stated is true ; yet it is not legal evidence,
and not being legal evidence, the court cannot act upon it.

Upon this view of the subject, I am compelled to de-
clare, that as the cause is a new one ; as no precedent has
been shown to justify such a proceeding ; as the law is
silent upon the subject ; and as there are two other modes
of proceeding, which are regular, and well understood, viz.
by applying to the judge out of court, and attaining a war-
rant upon legal evidence, or by the court ordering a grand
jury to be summoned instanter, and preferring an indict-
ment, this motion is overruled.

The attorney for the United States then prayed the
judge to issue his warrant to the marshal, to summon a
grand jury ; which was done accordingly.

---

*Judge Hanson's opinion, delivered in Baltimore County
Court on the return of a writ of* HABEAS CORPUS, *in the
case of* JOSEPH ALMEIDA, *who was imprisoned in virtue
of a warrant issued by a Justice of the Peace of the state
of Maryland for a supposed breach of a law of the Uni-
ted States.*

The 33d sec      The argument in this case had not proceeded very
of the act of  far, before it was manifest to me, that the learned attor-
September 24.  ney for the United States was entrammelled in a dilem-
1789,  which   ma, from which all his ingenuity could not extricate him.
invests judi-   If a justice of the peace of the state of Maryland had
cial officers of
a state with

any legal power to arrest a person charged with an of-
fence against the United States, it follows as a dictate of
common sense, that there must, independent of the laws
of congress purporting to give jurisdiction to state tribu-
nals, reside somewhere in the state, as an essential com-
ponent of the sovereign and protecting power, it has a
right to exercise over and in behalf of all persons within
limits, a right of deciding whether or not that arrest was
*properly* made ; and, consequently, that if Thomas W.
Griffith, Esq. had the power of issuing a commitment, this
court has the power of ordering a habeas corpus, and upon
its return, not only of deciding the sufficiency of the re-
turn itself, but of adjudging whether or not that intelli-
gent officer in this case, in issuing his warrant, acted sub-
stantially in conformity to the established principles of
law, regulating the subject of commitment.   To the war-
rant, in the present case, there is scarcely one among the
many objections that have been made to it, which has
not been ably and fully sustained.   One single material
defect is, however, sufficient to invalidate it ; and *that* of
the omission to make it returnable, at any time, or before
any person, affords, of itself, ample reason for quashing all
authority derived from it.   No proceeding, under the colour
of law, can be more susceptible of being wrought into an
engine of oppressive power, than that of depriving an indi-
vidual of his liberty, and of consigning him to imprison-
ment upon an " *ex parte* hearing." Every freeman has a
right to be confronted with the witness against him, in all
stages of his accusation ; the privilege is inherent, and the
right to demand the enjoyment of proving his innocence
simultaneous with the first step of the prosecution.   Before,
therefore, any commitment can be lawfully made, the ac-
cused is entitled to an opportunity of showing, either that
the act he is charged with is no crime in the eye of the
law—that if any wrong has been done he is not the per-
petrator of it ; or that however strong the evidence may be
against him, the offence alleged is of a class justifying the
discharge of his person, upon the production of such bail
as may be legally required of him.   If the condition of
society were otherwise, the time would have arrived, ere
now, when the occasion and the disposition would have
presented themselves of deciding all such questions in a

MARYLA'D.

United States
v.
Almeida.

power to ar-
rest, &c. for
criminal of-
fences against
the United
States de-
clared consti-
tutional.

A warrant
of arrest not
returnable at
any time, or
before any
person, is
void.

A prisoner
has a right to
be confronted
with the wit-
ness against
him, in all
stages of the
accusation :
the privilege
is inherent,
and the right
to demand the
enjoyment of
proving his in-
nocence sim-
ultaneous with
the first step
of the prose-
cution.

Arguments
"*ab inconveni-
enti*, 578, 579.

Arguments
in favour of
state rights.
580, 581, 582.

MARYLA'D.

United States
v.
Almeida.

very summary way. These preliminary points being settled, it becomes necessary to decide the main question, in which the whole of the case has resolved itself. That is to say, whether this court has power to commit for an alleged offence against the United States; and going one step farther, whether a law of congress can confer any judicial power upon state tribunals?

Although the adjudication of this point devolves upon us the duty of passing upon one of the greatest judicial questions, that of the constitutionality of a law of congress, yet, as every court is bound and presumed to know its own jurisdiction, we cannot avoid deciding whether we derive any jurisdiction from the law of the United States, passed in the year seventeen hundred and eighty nine, organizing the judiciary of the national government; and consequently whether the 33d section, and, indeed, many other sections, are constitutional. Notwithstanding this point has been expressly decided in Virginia and in Ohio, and collaterally in the supreme court of the United States, as may be implied from the scope of the opinions of judges Johnson and Story, as reported by Wheaton, it is with an irresistible awe that I approach it; for should our decision be adverse to the constitutionality, we virtually adjudge, that in this case, although it be a question arising under the constitution of the United States, the supreme court can exercise no appellate jurisdiction, inasmuch as we absolve ourselves from the obligation of sending up the record for their revision; and as so many other of the statutes of congress are dependent for their execution and utility upon the administration of them by state tribunals, the argument "ab inconvenienti" has great weight, and is entitled to the most serious consideration. The law of congress before us, was passed in the year 1789, the first session after the adoption of the constitution; it was proposed, debated and adjusted by a body of men, the chief and prominent characters of whom were themselves the erectors of our national institutions. It has been acceded to, and acted under, in this and every other state in the union; it has never been instrumental to any signal grievance, or complained of as a public or private evil; it has, on the contrary, been resorted to as a useful and salutary regulation; it has saved expense and trouble to

the general government without being burthensome to state officers, and there appears a degree of propriety and fitness, that as every individual state, and every officer thereof, is interested in, so they shall be rendered auxiliary to the execution of laws made for the benefit and protection of the whole. The law has obviated, on the part of the United States, the necessity of scattering at large a host of officers throughout the communities of the different states; it has kept them clear of creatures armed with authority, derived from an executive, foreign form, and not harmonizing with the state government, subject to regulation in their official capacities to which the people, amongst whom they may be placed to reside, would be unused and averse, and susceptible of being made the instruments of power whensoever it might be expedient for the general government to avail itself of engines calculated to propagate its opinions, and to uphold and enforce its measures; or, at least, to defeat by confounding the resort to legal remedy, in the heterogeneous process, or jarring and conflicting jurisdictions. But, notwithstanding all these considerations, I will proceed as concisely, and in as condensed a manner, as I am capable, to present my view of the subject. The national government appears to me to stand in relation to the states, as civil society does to the individuals composing it. Both consist of a congregation of surrendered or delegated rights; and in neither case can these conceded powers be enlarged, diminished or returned to the parties granting them, but by their own consent, collected in such manner, in the first case, as the constitution providing for its amendment should prescribe; and in the second, as the laws of the social compact should direct.

The several independent states have agreed, by the constitution, to invest the judicial power of the United States in one supreme court, and in such inferior tribunals as the congress may from time to time ordain and establish; and then the constitution goes on to define, what is the judicial power of the United States collectively, as a national government, as I understand it, in contradistinction to the judicial powers of all the states separately, viz:—The judicial power of the United States, shall extend to all cases in law and equity arising under

MARYLA'D.

United States
v.
Almeida.

MARYLA'D.

United States
v.
Almeida.

the constitution, the laws of the United States, and treaties made, or which shall be made under their authority; to all cases affecting ambassadors, and other public ministers; to all cases of admiralty and maritime jurisdiction; to controversies to which the United States shall be a party; to controversies between two or more states, between a state and the citizens of another state, between citizens of different states, between citizens of the same state claiming lands under the grants of different states, and between a state, or the citizens thereof, and foreign states, citizens and subjects. From the word "all" being used in the first part of the clause, dropped in the middle, and again resumed, it has been inferred, that exclusive jurisdiction not in every case enumerated, was delegated to the United States. Be this as it may, the states, beyond all controversy, reserved to themselves some, if not all rights not expressly given away, and having done so, they unquestionably had the power and exercised it, of creating judicial tribunals for the protection of such of those rights, and the administration and exposition of laws passed in regard to them, as they might deem proper; and if they deemed it expedient to leave their citizens without tribunals, having authority to afford them remedies in certain cases, and especially those where the United States had clearly jurisdiction, if only concurrent, where exists the power of congress, under the constitution, to compel the states to create such courts, or what is there to prohibit the states from enjoying the exclusive use, for state purposes, of their own courts and civil officers, and of prescribing as a condition of the tenure of office, that they should, as the constitution of Maryland has done, exercise no office of profit or trust under the government of the United States? What rightful power has the congress, after the adoption of the constitution and the investment thereby of judicial power in the general government, to enlarge, diminish, or return any of its powers to the states? If it had a right to confer any power, what power has it not a right to confer, unless expressly prohibited by the letter of the constitution?—and state tribunals must thus be converted into courts of admiralty and maritime jurisdiction. In fact, if congress has the power of conferring on them the duty of arresting, of committing, hold-

ing to bail or discharging without it, all of which are judicial acts, because they imply an act of judgment, and are not mere ministerial duties, it must also possess the power of assigning to them that of trial, conviction and sentence to punishment. Surely it cannot be contended that such authority is derived from the clause that the judicial power of the United States shall be vested in a supreme court and in such inferior courts as the congress may, from time to time, ordain and establish, and that under this interpretation, state courts may, at the pleasure of congress, without their consent or knowledge, or the sanction of the state under which they act, be converted into United States courts; if such were the case, congress would have nothing more to do, in order to destroy a state judiciary, than to assign the judges duties under the general government, and as fast as the state of Maryland created courts, congress might prostrate them until its constitution shall be altered and its officers allowed to hold offices under the United States. To whom should we then look for the protection of reserved rights? The first section of the constitution of the United States is clearly prospective: it declares that the judicial power shall be vested in one supreme court, not in a court as it were already created, but to be created, not in inferior tribunals in existence, but such as congress shall from time to time, ordain and establish hereafter; evidently intending these courts to be United States courts, responsible and impeachable by the United States for neglect of duty or the abuse of power, and forming a constituent part of the judicial system of the United States. Again, if congress has power to return to the states judicial powers, or enlarge the power of state courts, why should it not have the power of returning to, or enlarging and diminishing the legislative and executive powers; and if it could assume such power as to all the states, what is to prohibit it from exercising it as to any one or more of them? And thus at once might be frustrated the wisdom and foresight of our fathers, in securing to the small states an equal representation in the senate of the United States with the large ones; by yielding to a majority of congress the power of imparting superiority and predominance to any one or more states, by returning to them sovereign, judi-

MARYLA'D.
United States
v.
Almeida.

cial and executive powers conceded to the general government, whilst it withheld them from others. These may be termed extreme cases, but it must be observed, that if the occurrence of such cases had not been slighted and overlooked, many revolutions of governments would have been escaped, which have involved in them the servitude and wretchedness of millions. If congress has power to require of the state courts to take cognizance of any matters assigned or relinquished to the supreme and inferior courts of the United States, it surely is not limited as to the extent of this demand; and under such a construction, all the business of the general government might be imposed upon state tribunals, whose judges being thus subjected, it is easily comprehended would be compelled either to resign their seats upon the bench or to exact of the state governments, by whom they were employed, an increase of compensation commensurate with the enlargement of their official duties; and the general government, by these means, might be enabled to impose and exact a tax, of any one or more states, in a way unjust and unequal, and never contemplated by the genius of our government, or letter of the constitution. Besides, the constitution of the United States prescribes, that the judges shall hold their offices during good behaviour, and shall receive for their services a compensation, not to be diminished during their continuance in office. Now, the tenure by which state judges hold their offices, it is notorious, varies in almost every state, and, here particularly, it essentially differs from that provided by the constitution of the United States; and civil officers are expressly forbidden to hold any office of profit or trust under the general government; how, then, can the congress of the United States compel them to accept one, for which they shall receive a compensation, not to be diminished during their continuance in office? Again, the manner of their appointment is totally different. The constitution of the United States requires the judges to be appointed by the president and senate; can it, then, be seriously contended, that congress, by law can, not only ordain and establish judicial tribunals, convert to its own use state courts, some created since, others in existence before itself was in being, but that it should also forthwith pro-

ceed to the appointments of judges thereof, without the consent of the president, the senate, or the judges themselves. Certainly, snch a doctrine asserts the power, and would have the inevitable consequence to absorb into the general government, all state sovereignty, and by thus appropriating and controlling state courts, indirectly to modify, regulate, abridge, invade or destroy the rights and privileges reserved to the states, for the protection of which they had organized their courts of justice. Have the states any where expressly, or by implication, delegated any such power to the general government? It has, however, been urged as an argument in support of this motion, that in many cases, the state courts and the United States courts, have a concurrent jurisdiction, and that, therefore, the judicial power does not exclusively belong to the supreme and other courts of the United States ; and strength is attempted to be given to this idea, from the word "all" not being used throughout, but dropped, when controversies between the United States and any one state are provided for. If there can be any discrimination between the judicial power and all the judicial power, it may possibly have been, with a view of avoiding any expression that might be construed to take a jurisdiction from the state courts which they had before exercised, to wit, that of deciding claims for, and against the United States, under the old confederation, and which the constitution subsequently expressly reserves to them, that this variation of language was adopted. But if this proves any thing, it proves too much, (there being no denial, that the national government has power to punish offences against its own laws) for it rather implies, that where the word *all* is used, there is no concurrent jurisdiction, and that concurrent jurisdiction existed only in cases where the state courts had a previous cognizance : Besides, if the constitution, with a view to the doctrine of reserved rights, gave or recognized a concurrent jurisdiction, there could be no necessity for the law of congress to give it ; and if the state courts had it not before, and did not get it from the constitution according to the principles I have endeavoured to enforce, they could not obtain it by a law of congress. Whatever doubt, therefore, there may have been to the jurisdiction, in all cases,

MARYLA'D.

United States
v.
Almeida.

MARYLA'D.

United States
v.
Almedia.

with respect to the criminal law of the United States, I can entertain none; for, it is obvious that previous to the constitution, there could be no criminal jurisdiction of offences against the United States any where; and, if the state courts could subsequently have it, they must derive it from the constitution itself. But this no where appears on the face of the instrument; and, inasmuch as the legislative, executive and judicial powers of the state governments, consists in the reservation of rights not delegated, and cannot in any degree be composed of concessions from the national government, which is itself made up of what the states had parted with, it would be, according to my apprehension, too great an incongruity to construe the right of conferring jurisdiction to be vested by the constitution in congress; and it cannot be too constantly borne in remembrance by the civilian and statesman, that if congress could enlarge or diminish the power of state authorities, it would necessarily follow, that our national government would present the singular anomaly of one co-ordinate branch of a government possessing, as a component part of it, the inherent constitutional means, not only of its own dissolution, but that of undermining the basis of the whole fabric in the surrender, without the consent of the parties to the contract, who must be either the states or the people, of legislative, judicial and executive functions.

Upon the whole, it appears to me, that every cotemporaneous exposition of the views and considerations of the framers of the constitution, all traditional information of their conferences, and the opinion of enlightened statesmen who have before and since discussed it, carry with them a weight too impressive to be resisted; and that they all concur in converging to the position, that every exercise of control over, or interference with state authorities, on the part of the United States, where the right is not explicitly granted, has a tendency to convert our confederative republic into a consolidated government; and that unless such constructions are guarded against in time, at some day, a popular and ambitious executive might become the "architect of ruin" of the liberties of the people, by attaining a sufficient ascendancy to contract or dilate state powers according to circumstances; to convert independent sovereignties

into vice royalties, subservient to his mandates; and, in fine, to reduce a state, as it relates to us, into a mere "imperium in imperio," and possessing no more distinct and separate rights than the mayor and city council of a city could exercise in opposition to the legislature, judiciary and executive of a whole state; and although it may be appositely said, that state governments, as regards the national government, ought not to be considered as sovereign powers foreign to each other; that they are all parts of the same whole, and that as the people of the states are the people of the United States, the same policy, laws, and process may and ought to pervade and regulate the whole empire, as the same blood which flows into and nourishes the heart, runs through and invigorates every artery and fibre of the body; yet to my mind, the uniformity of a constellation is more illustrative, in which the national sovereignty, whilst performing its evolutions, is revolved round by the states, on their own axis, and in their own orbits, and if, in departing from its course, it should approach to concussion with its satellites, they would be jostled and obtruded from their spheres, whilst its own functions would be obstructed, and the order and conformity of the whole system deranged and destroyed.

I am of opinion, therefore, whatever doubt may exist as to the extent of jurisdiction common to state and United States' courts in civil cases, that state authorities cannot act in any kind of prosecution for offences against the laws of congress.