*Decision of the Hon. Langdon Cheeves, in the case of Andrew Rhodes, delivered at Chambers, on a writ of Habeas Corpus ad Subjiciendum.*

Ex parte
Andrew Rhodes. } HABEAS CORPUS.

*Edward P. Simons, Esq.*, Counsel for the Prisoner.

*Thomas Parker*, Counsel for the United States.

The prisoner is brought before me, at Chambers, on a writ of *Habeas Corpus ad Subjiciendum*, and the officer in whose custody he is, exhibits as the authority by which he detains him, a warrant of commitment under the hand and seal of John Hinckley Mitchell, a justice of the peace of this state, on a charge that the prisoner has forged or counterfeited a number of protections for American seamen. This, it is believed, is no offence against this state, but is an offence against the laws of the United States.

I am called upon, on the part of the prisoner, to discharge him from custody, under this warrant, because it contains no accusation under the laws of the state, and it is contended, the magistrate who committed him, being an officer of the state, had no authority to commit

The act of granting a warrant of commitment is a ministerial and not a judicial act. The judicial power of the United States under the 1st section and 3d article of the constitution, in criminal cases, is not exclusive of the authority of the States. Congress has a right to con-

CHAMBERS him for an offence against the United States, because the 33d section of the judiciary act, (Laws U. S. vol. 1. p. 72.) which in its terms authorizes such commitments, is unconstitutional.

Ex Parte Rhodes.

stitute any citizen of the United States a conservator of the peace, although conservators of the state. The 33d section of the act of September 24, 1789, is constitutional.

It is contended,

1st. That by the 1st section of the 2d article of the constitution of the United States, "The judicial power of the United States shall be vested in one Supreme Court, and in such inferior courts, as congress shall, from time to time ordain and establish"—and that this judicial power, in criminal cases, is, under the constitution, exclusive of the authority of the states.

2d. That the act of granting a warrant of commitment is a judicial act, and therefore, in cases under the laws of the United States, to be exclusively performed by an officer of the United States.

3d. That it is my duty, as a judge of this state, under the habeas corpus act, to take cognizance of this case on the grounds stated.

1st. All these questions are important and difficult; and the first is of peculiar importance. It has been a controverted question from a period anterior to the adoption of the constitution of the United States, and still remains unsettled; and I am happy to be relieved by the opinions I have formed on the other questions, which the case presents, from the necessity of deciding this.

2d. Is the act of granting a warrant of commitment a judicial act? I think it is not. I am aware of a late decision (the case of Joseph Almedia, in Maryland) in which this question has been determined in the affirmative. In this opinion I cannot concur. The only authority which is relied upon to support this opinion, is a single expression contained in the decision of the Supreme Court of the United States, in the case of the United States v. Judge Laurence. (3 Dallas' Rep. 53.) This authority, it is evident, has been misconceived. That was a case in which, under our consular convention with France, Judge Laurence, who was then the district judge of the United States for the district of New York, had been required, by the vice consul of the French republic, to issue a warrant for apprehending captain Barre, commander of the frigate Le Perdrix,

See post.

belonging to the French republic, as a deserter. The judge was of opinion, that before the warrant could issue, the consul should prove by the register of the ship or roll d'equipage, that captain Barre was one of the crew of the Le Perdrix. The counsel offered other proof; but the judge thought this indispensable; whereupon an application was made to the supreme court for a mandamus, to compel the judge to issue a warrant. The court, in deciding the case, refused the mandamus, and in giving their reasons, say, "It is evident that the district judge was acting in a judicial capacity, when he determined that the evidence was not sufficient to authorize his issuing a warrant." It is very manifest that it is to his judgment on the evidence the court allude, when they say he was acting in a judicial capacity, and for that reason they refuse to issue a mandamus, and founding their judgment on this distinction, they virtually declare, that the granting a warrant of commitment is not a judicial act. I am aware it may be said, as all commitments must be founded on some evidence, in all cases of commitment a judicial act must be performed. There is certainly an opinion to be formed on the nature and sufficiency of the evidence adduced; but if such an exercise of the mind be a judicial act, then almost every function of all the inferior officers of justice will be judicial, and even constables, who have, in certain cases, the power of commitment, will be judicial officers. This is preposterous. There must be some more correct view of the subject, and to obtain it let us resort to authorities. Our object is to ascertain whether the function of a justice of the peace, in granting a warrant of commitment, be judicial or ministerial. It is not denied, that a justice of the peace does possess certain judicial powers, but it is denied that the granting a commitment is a judicial act. We must carefully distinguish between the original duties of a justice of the peace and those which have been subsequently imposed upon him. The first constituted him merely a conservator of the peace, the latter have made him a judicial officer; the first authorized him to apprehend and commit offenders, the latter, in many cases, have conferred upon him the powers to try and convict.

Sir William Blackstone, (1 Com. 351.) after speaking

CHAMBERS

Ex parte
Rhodes.

CHAMBERS of the occasion of the first appointment of these officers,
says, "It was ordained in parliament that for the better
Ex parte maintaining and keeping of the peace, in every county,
Rhodes. good men and lawful, which were no maintainers of evil,
or barrators in the county, should be assigned to keep the
peace; and in this manner, and upon this occasion, was
the election of the conservators of the peace taken from
the people and given to the king; this assignment being
construed to be by the king's commission: but still they
were only conservators, wardens or keepers of the peace
till the statute 34 Ed. 3. c. 1. gave them the power of
trying felonies, then they acquired the more honourable
appellation of justices."

"The power, office and duty of a justice of the peace
depends on his commission, and on the several statutes
which have created objects of his jurisdiction. His com-
mission first empowers him singly to conserve the peace,
and thereby gives him all the power of the ancient con-
servators at the common law, in suppressing riots and
affrays, in taking securities for the peace, and in appre-
hending and committing felons and other criminals." (Id.
353, 354.)

Who are these conservators of the peace who possess
the same authority to commit as justices of the peace ?
Are they judicial officers ? Among others, sheriffs are
conservators of the peace. "Constables, tithingmen,
and the like, are also conservators of the peace within
their own jurisdictions; and may apprehend all breakers
of the peace, and commit them till they find sureties for
their keeping it." (Jacob's Law Dict. tit. Conservator
of the Peace, vol. 2. p. 26.) "Conservators of the peace
did commit at common law, and it was incident to their
office, as it is to the office of justices of the peace who are
not authorized by any express words in their commission,
but do it, *ratione officie*," (15 Viner 8. tit. Justices of the
Peace.)

"It seems that the power of such conservators of the
peace, whether by tenure, election, or prescription, was
no greater than that of constables at this day, unless it
were enlarged by some special grant or prescription."
(Ibid 4.)

Holt, Ch. J. said he knew not whether, at first, justices
of the peace were more than high constables; but the

statute that made them complete judges is that of 34 Ed. CHAMBERS
3. (Ibid.)

Lord Hale, in his analysis of the law, after having said that there are two kinds of subordinate civil magistrates, those that have a power of jurisdiction, and those that are without jurisdiction, says, "The persons that exercise this power, or jurisdiction, are called judges or judicial officers," (sec. 11. p. 26, 27.) and in sec. 12. " of inferior magistrates *sine jurisdictione*," (p. 29.) he speaks thus: " The sheriff of the county is the greatest ministerial officer; and I call him magistrate because he is a conservator of the peace of the county," &c. &c. &c. " Constables and head constables. These, though they have not any jurisdiction to hold cognizance of any fact, yet are conservators of the peace."

Dr. Sullivan, in his Commentary on Magna Charta, speaking of the warrant of commitment, says, " Thirdly, the warrant must not only contain a lawful cause but have a legal conclusion, and him safely keep until delivered by law; not until the party committing doth farther order: for that would be to make the magistrate, who is only ministerial, judicial, as to the point of the liberty of the subject." Lectures on the Constitution and Laws of England, (vol. 2. p. 266.)

I presume I have now established beyond all doubt that the act of the magistrate, in granting a warrant of commitment, is a ministerial, and not a judicial act. It may be useful, however, to spend a moment longer on the nature of that judicial power which is spoken of in the constitution. There are functions to be performed by inferior magistrates, commissioners and other like officers, which leave in them a discretion, which in that particular, resembles judicial authority, but is not of the nature of that judicial power which forms one great branch of government. It is the latter, which is spoken of in the constitution. It is that which Lord Hale defines to be " a power of jurisdiction," and of which he farther says, " the persons who exercise this power or jurisdiction are called judges or judicial officers; the places or tribunals wherein they exercise their power, are called courts; and the right by which they exercise that power is called jurisdiction." (Analysis, sec. 11. p. 26, 27.) He then goes on to enumerate the superior

and inferior courts of England, and gives us a clear and distinct idea of what may be embraced, and what is meant by the 3d art. of the constitution on this point. They both mean to speak of trial, judgment, emphatically of the administration of justice, and not the little functions and functionaries, which are merely incipient and ancillary to this great essential power, which are inseparably incident to it, and can with no propriety be called implied powers.

If it has been proved that the act of the magistrate in committing an offender is a ministerial act, then the ground on which the counsel for the prisoner has put this argument, which is the same relied upon in the case of Almeida, though he has enforced it with ability and eloquence, entirely fails.

The only question that remains is, whether the legislature of the United States has a right by a statute, forbidden by no provision of the constitution of the United States, to give a limited authority to conserve the peace to one or more of the citizens and subjects of the said United States, who happen at the same time to be conservators of the peace of the state? If not forbidden by the constitution of the United States, what other power can forbid it? That constitution expressly forbids all it does not authorize. If not so forbidden, the statute is the supreme law of the land. All the minor arguments of expediency, such as blending jurisdictions, neglect of state duties, want of responsibility and others of the same description, are of little weight in themselves, and are not for judicial, but legislative consideration. Throughout the whole system of the government, the legislative, judicial and executive functions of the union and the states are blended; the responsibility of the citizen is divided, and duties to the states are superseded by duties to the union. But what then? Is it for judges, therefore, to say, they deem them inexpedient, and because they deem them inexpedient declare them void? I will not say that expediency shall be always rejected in a judicial judgment on the meaning of the constitution, but it will seldom be a very weighty consideration, and ought always to be used very cautiously. But I think it highly expedient, that congress should confer this authority on the ministerial officers of the states. It is as

useful to the states as the union, that the crimes against the United States should be punished. Their interests can seldom, perhaps never, be wisely separated. The crimes punishable under the laws of the United States are great and important, but few in number. Without the aid of the ministerial officers of the states, to have the laws of the United States effectually executed against a few offenders, (probably not one hundred in a year in all the states) it would be necessary to appoint and scatter over their vast territory many thousands of justices of the peace, coroners, constables, &c. The attempt to execute the power, would be as impracticable as it would be ludicrous. But it is said the states are to watch with jealousy the acts of the general government, (a monstrous heresy in the politics of this country,) and if it use the agency of the officers of the states, it will have a tendency to a consolidation of the state governments.

Exactly the reverse is the sound conclusion. The necessary dependence, practically, of the general government on the states, in many particulars, is one of the points in which its weakness has been most obvious and most lamented.

The counsel for the prisoner, taking it to be granted or proved that the act of the magistrate was a judicial act, contending that the constitution had established a mode in which all judicial officers were to be appointed, and that an act of congress, giving authority to the magistrates of the state, was a violation of this provision of the constitution. It would not follow, however, if the function were judicial, that the appointment must be made by the president and senate; for the constitution authorizes congress, by law, to vest the appointment of such inferior officers, as they think proper, in the president alone, in the courts of law, or in the heads of departments; but the function is not judicial; the officer, consequently, not judicial; and, therefore, the argument, as urged, does not apply. But it may, perhaps, be insisted, that though the constitution does authorize congress, by law, to vest the appointment of inferior officers in the president alone, in the courts of law, or in the heads of departments, it does not authorize congress, though both houses and the president should unanimous-

ly concur, itself to appoint immediately by law. This would really be construing the constitution like an old pleading, without allowing the benefit of the statutes of Joefails.— *Qui cadit a syllaba, cadit a tota causa.* A rational construction, it would seem, would authorize congress to do itself what it can, at its pleasure, authorize an inferior body or an individual to do ; but that is not the question. It may be safely admitted, that congress cannot directly by law appoint an officer whom it can authorize an individual to appoint, and yet the difficulty will not occur in this case. This is not the case of an appointment. The magistrates of the state are not by the act of congress, constituted officers of the United States. They are merely authorized to do a certain act. The case may be easily conceived in which a magistrate of a foreign state may, by act of congress, be authorized to exercise an equivalent power. That it is not an apppointment in the sense of the constitution, will be proved by reference to the undisputed practice of some of the state governments.

The constitution of Pennsylvania provides that the governor shall appoint justices of the peace; (art. 5. sec. 10.) and that they shall be commissioned during good behaviour. But by an act of the legislature of that state, passed 20th March, 1810, all the powers of justices of the peace are vested in all the aldermen of the city of Philadelphia, who, I believe, are elected annually by the people of that city.

So, in New York, justices of the peace are appointed by the governor and council, according to the express requisition of the constitution, and hold their offices during the pleasure of the governor and council. But by an act of the legislature of that state, (2 Laws of New York, 508.) the aldermen of the city of New York, Albany and Hudson, are vested with the same powers as justices of the peace.

By the constitution of South Carolina, justices of the peace shall be nominated by the senate and house of representatives, jointly, and commissioned by the governor. (1 Brevard, 468. 2 Brevard, 175.) Yet the clerks of the courts, the wardens of the city of Charleston, and many other officers of the state, are vested by act of the legislature with the powers of justices of the peace. The

like case probably occurs in almost every state of the union, and the argument of unconstitutionality which we are now examining will equally apply to them all.

I am then satisfied, that in relation to the case before me, the 33d section of the act of congress, commonly called the judicial act, is constitutional and expedient, though I reject the argument of expediency, from the grounds on which I rest my decision. It is not a case in which I have a right to weigh it.

3d. I might here leave the case ; but I deem it proper to consider the third ground. I think I have no jurisdiction over the case. I am aware of but three cases in which this question had been made. The case of Almeida, already mentioned ; the case of Emanuel Roberts, (2 Hall's Law Journal, 192.) in Maryland ; and the case of Jeremiah Ferguson, in New York, (9 Johns. Rep. 239.) In the first case jurisdiction was assumed, and the prisoner discharged. The second was the case of a minor enlisted in the service of the United States, and Nicholson, chief judge, determined against the jurisdiction. He does, indeed, say, in speaking of an extreme case which was put by counsel, of great oppression and injustice, that he would interpose and discharge the prisoner in the case supposed, but he adds, " If in such a case I should exceed the technical limits of my authority, I should have the approbation of all good men, for resisting oppession under the colour of law." This is certainly no argument in favour of jurisdiction, while the judgment in the case is on the want of it. In the last case, which was also the case of a minor who had been enlisted, the court refused to interfere on other grounds. But Chief Justice Kent declares explicitly, that the state courts have not jurisdiction where the arrest is under the authority of the United States. In this opinion I concur. If there be cases in which the state courts have jurisdiction of the principal matter, I am of opinion they may entertain an incidental or collateral question ; they may, therefore, in such cases, release under a writ of habeas corpus, on the ground of illegal confinement, because the prosecution is groundless, or for other sufficient cause. This authority may, perhaps, be exercised by courts having a superintending power, though they may not have

jurisdiction for the purpose of trial, for they have authority to restrain and annul the acts of inferior jurisdictions. But in a case like the present, where the state courts in no case, and under no circumstances, can take cognizance of the offence charged, to punish or acquit, and where the functionary appealed to is himself, in all questions under the laws of the United States, subject to the control of their high tribunals, all pretence of jurisdiction seems to vanish. I cannot, nor can all the judicial authority of the state, discharge a defendant in a civil suit who has been held to bail in the courts of the United States, however illegal the arrest may be, because I have no jurisdiction; and yet it is seriously imagined that I have, at my chambers, authority to take their criminal jurisdiction, which is by their laws expressly exclusive, out of the hands of their tribunals, and to determine the acts of the national legislature unconstitutional and void. Nay, more, in this state any two justices of the peace, one of whom shall be of the quorum, have authority to carry the habeas corpus act into execution, and have on the subject all the authority I enjoy. They, too, then, have a right to determine on the constitutionality of the acts of congress, and to release those who are amenable to the United States in their criminal courts. But the pretence for all this is, that the liberty of the citizen is to be preserved inviolate. Is it meant by this, that he shall be exempt from all the usual modes of trial instituted for the preservation of that very liberty? That the march of justice is to be devested of every thing staid and sober? That instead of her solemn and learned judgments, we are to have *pie poudre* expositions of the great act of our national union? But against whom do we seek this protection? The government of the United States—the government of the people themselves, whose greatest power returns into their hands biennially, and all of it at short intervals—a government as able, as much bound, and no doubt as willing to protect the citizen as the governments of the states— a government which has its habeas corpus act, and its judges bound under the most solemn sanctions to execute it—a government to which the states constitutionally look up for the preservation of their free institutions. That jealousy which we sometimes see recommended,

is bad law, and worse policy. I deny that it is inculcated by a true understanding of the constitutions of the states. That it is necessary to the preservation of state rights, or that it can conduce to national happiness, or national greatness. It may make us busy about some little factious privileges which are in no danger. But a regulated liberty, under the protection of stable institutions, will be best and longest secured to us, by regarding the government of the union in a spirit full of confidence—in a temper devoid of jealousy.

Finally, I am of opinion I have no jurisdiction of the case. Let the prisoner be remanded.