Hall, District Judge,
On Saturday, the 16th of March last, a writ of habeas corpus was allowed in this case, returnable at the stated session of this court, held at Utica, on Tuesday, the 19th of that month. At that term a return was made by Capt. G. W. Walker, United States army, setting forth in substance (among other things), that the petitioner was a regularly enlisted soldier in the army of the United States, and was held to service therein by virtue of such enlistment; and that while so held he deserted the service of the United States, “ thus committing an offence against the laws of the United States, which crime, under said laws, is cognizable exclusively by a court of the United States of competent jurisdiction, denominated a General Court Martial.” The return also set forth the arrest of the petitioner, as an alleged deserter, in consequence of the evidence contained in an affidavit made by one James Eiley (a copy of which was annexed to the return), and in a descriptive list furnished by the military authorities. The most material statements of such affidavit and descriptive list will be hereafter more particularly set forth.
The return also set forth the making of a military order for the petitioner’s transportation to fort Columbus, in New York harbor; that afterwards, and just before he was placed on the cdrs under that order, a writ of habeas corpus was allowed by Hon. George D. Lament, county judge of Niagara county, and was served upon the respondent; and that after a full and fair hearing before said judge, the petitioner was remanded to the custody of the military authorities.
The return, as originally drawn, concluded as follows: “ This respondent further claims that this matter should be adjudged res adjudicata, and the habeas corpus dismissed,as no new matter has arisen subsequently to the prior adjudication which can in any way.affect this question; and that no new state of facts between the parties has arisen subsequently to the prior adjudication.”
*270 By an addition to this return, the proceedings before Judge Lamont were presented and referred to as a part of the return, and “ containing all the matters set forth, and the evidence adduced by the petitioner and respondent.”
The return was immediately traversed, and the petitioner alleged (among other things) that he was not a regularly enlisted soldier in the army of the United States; that he was not held or bound to serve therein by virtue of any such enlistment; and that he had not deserted from the army; that on the hearing before Judge Lamont, the counsel for said Walker, or for the United States, objected to the hearing of the case, or to the said judge inquiring into the cause-of the arrest, on the ground that he had no jurisdiction to do so, for the reason that said Walker had returned that he held the petitioner under the laws of the United States.
The petitioner, by his traverse, also insisted that Judge Lamont had no jurisdiction of the case heard before him; both parties thus taking, in in-this court, in respect to that question, positions directly opposed to those they occupied before Judge Lamont.
Both the return and traverse contained many other allegations not necessary tó be considered in the decision of the case, as finally presented.
After a brief argument it was announced by the court that its opinion then was that Judge Lamont had jurisdiction of the proceedings before him upon habeas corpus; and that (conceding his jurisdiction) such proceedings, and Ms decision thereon, were no bar to proceedings by habeas corpus in this court. It was, however, intimated that these questions wonld be reserved for further consideration, and that they might be again discussed by the counsel when the case was argued upon the merits.
The petitioner, being present with his witnesses and in custody, pressed for an immediate trial;- but the counsel for the government stating that, in case the proceedings *271 before Judge Lamont were not held to bar the petitioner's right to proceed in this court, he desired time to procure witnesses to show that the petitioner was an enlisted soldier, and to establish his identity as the person who enlisted under the name of William Sloan; and also stating that some of such witnesses were at Little Rock, in Arkansas, where the company to which the petitioner belonged was then stationed; it was determined to postpone the hearing of the case until the present term. And it was announced that thé questions of res adjudicaia and of the jurisdiction of Judge Lamont would be examined by the judge of this court in vacation.
The question in regard to the effect of the prior adjudication was supposed to involve the examination of the question of jurisdiction, for it was not contemplated that it would be contended that the decision of a tribunal which had no jurisdiction of the questions in controversy could be interposed as an effectual bar to an inquiry into the merits of the case before another court of competent jurisdiction.
It was well understood that the question of the juris- " diction of State courts and judges, in cases like the present, had been frequently denied, and that there was a conflict of authority upon the question. The knowledge of this conflict, and the fact that I had theretofore examined and noted most of the earlier decisions upon this important question, induced me, at the March term, to promise to examine it further during the vacation; and, having-redeemed that promise, I shall now state the result of my examination, notwithstanding the fact that some five or six days before the commencement of the present May term, I received from the counsel who, at the last term, insisted that the proceedings before Judge Lamont were a legal bar to the proceedings commenced in this court, an elaborate brief in favor of the position then sought to be maintained by his opponent—that State courts aud judges had' *272 no jurisdiction in cases like that before Judge Lamont. I deem it proper and expedient to do so, because the question is one which will often arise; and it will probably save future labor if I now state what will be deemed the law of this court until it is overruled by higher authority. And I am not the less inclined to take this course because I am unwilling that nearly all the labor of disposing of this class of cases, in a judicial district containing nearly two millioüs and a quarter of people, should be unnecessarily and improperly cast upon the judge of this court whilst his other judicial duties require more labor than any single judge should be required to perform.
This question of jurisdiction was considered open to discussion for several years after the adoption of the Federal Constitution, very few cases having arisen in which it became necessary to decide it; but for nearly thirty-five years prior to 1859 it had, I think, been considered defin-/ itively settled in favor of the jurisdiction of State courts and judges. The question will therefore be considered as one depending upon the authority of decided cases more than upon any argument now to be advanced; and I shall not attempt to repeat the arguments by which the doctrines of decided cases have been sustained.
The position taken by the' learned counsel for the government, in his brief furnished just before the commencement of this term, is stated in his fourth point in this language: “ Judges of the State courts have no power to issue a writ of habeas corpus, or to continue proceedings under it when issued, in cases of commitment or detainer under the authority of the United States.” Under this point he cites twenty-eight different cases or authorities, which I shall presently consider; but before doing so it is proper to say that the question is not whether a State judge shall issue the writ when it appears upon the application.for its allowance that the petitioner is in fact lawfully committed or detained under the authority of the United States, or shall *273 proceed under the writ and order the petitioner’s discharge, after it is admitted or proved that the party is so committed or detained; but whether the judge can entertain jurisdiction to inquire into and require proof of the authority of a party detaining the petitioner under color or pretence of the authority of the United States, and can order his discharge if the imprisonment and detention be unlawful? If the petitioner be in fact lawfully detained under the authority of the United States, that is under the laws of the United States, for “ Ours is a government of laws and not of men,” then neither State courts nor State judges, nor the courts or judges of the United States, should discharge him on habeas corpus, except upon bail in cases where such court or judge is authorized to bail the prisoner.
Before discussing the authorities above referred to, I shall copy the statement of them, as made in the. printed matter of the brief furnished; and, not having sufficient time to reduce this opinion to a more orderly method, I shall remark upon these cases, and refer to other cases, very much in the order in which they appear upon my notes made at the time I had them under consideration.
• I extract the citations in support of the position above státed, or rather in support of the position that Judge Lahont had no jurisdiction, as they are found in the brief, as follows:
1. In re. Private Husted, U. S. Army, in 1799. Decision by Ch. J. Lansing, N. Y. Supreme Court. (1 Johnson’s Cases, p. 136.)
2. In re. Landsman Emanuel Roberts, U? S. Navy, in 1809. Opinion by Ch. J. Nicholson, Md. Supreme Court. (2 Hall’s Law Journal, 192.),
3. In re. Private Jeremiah Ferguson, Thirteenth U. S. Infantry, in N. Y. Supreme Court (full bench), 1812. Opinion by Ch. J. James Kent. (9 Johnson’s New York Rep., 239.)
*274 4. 'In re. Sims, in 1859. Opinion by Ch. J. Shaw, Mass. Supreme Court. (7 Cushing’s Mass. Rep., 285.)
5. The State of New Jersey v. Lt. Col. Zulick, Second D. C. Vols., 1862, in re. Private Frederick Kniesch, Jr., a minor under eighteen, enlisted without consent and held as a deserter. Opinion by Judge E. D. Ogden, N. J. Supreme Court. (5 Dutcher’s N. J. Rep., 429.)
6. The State of New Jersey v. Asst. Surgeon John L. Janeway, TJ. S. Army, on habeas corpus to discharge Private Michael J. Welch, a minor, in Fourteenth N. Y. Vols., for illegal enlistment. Opinion by Judge Ogden, N. J. Supreme Court, after consultation with associate judges at Trenton. 1 (
7. In re. Jacob Spangler, in 1863, in Michigan Supreme Court. Concurrent, opinions by Ch. J. Martin, and Judges Christiancy, Campbell and Manning. (2 Am. Law. Reg. [N. S.], 598.)
8. In re. Private Charles E. Hopson, N. Y. Vols., 1863. Opinion by Justice Bacon, N. Y. Supreme Court. (40 Barbour’s Supreme Court Rep., 34.)
9. In re. Private James Jordan et al., Thirteenth N. Y. Vol. Artillery, 1863. Opinion by Justice E. D. Smith, N. Y. Supreme Gourt. (2 Am. Law Reg. [N. S.], 749.) •
10. In re. Private James Kiernan, a general service recruit, IT. S. Army, in N. Y. Supreme Court, First Judicial district, October 24, 1866, before Justice Barnard.
11. In re. Private David Clark, a general service recruit, • U. S. Army, in N. Y. Supreme Court, First Judicial district, October 31, 1866, before Justice Barnard.
12. In re. Private John Isaac Kent, general service recruit, IT. S. Army, in N. Y. Supreme Court, First Judicial district. Opinion by Justice Barnard, Nov. 1, 1866.
13. In re. Private John Francis McLaughlin, general service recruit, IT. S. Army, in Court of General Sessions, city and county of New York. Decision by Hon. A. D. Russell, City Judge, Dec. 1, 1866.
*275 14. Bx parte Andrew Rhodes, in 1819. Opinion by Judge Oheeves, S. C. Supreme Court. (12 Niles W. Reg., 264, and 2 Wheeler’s Crim. Cases, 559.)
15. In re. Private Benjamin Sanis, a minor sixteen years old, on habeas corpus, in Recorder’s Court of Charleston, S. C. Reported in Charleston Courier, Oct. 20, 1862.
16. In re. Private William Reynolds, alias Sloan, a deserter from the Nineteenth U. S. Infantry on habeas corpus, in County Court Niagara county, N. Y. Opinion by County Judge George D. Lamont, March 15, 1857, Lock-port, N.Y.
17. In re. Private George Reilly, general service recruit, IT. S. Army, an indentured minor apprentice, in N. Y. Court of Common Pleas. Opinion by Hon. Chas. P. Daey, First Judge. Reported in N. Y. Daily Tribune and N. Y. Herald of March 19, 1867.
18. The State of Ohio v. Brevet Map B. R. Kellogg, IT. S. Army, on habeas corpus, in re. Private F. T. Murphy, an apprehended deserter, in Probate Court of Lucas County, Ohio. Decision by Hon. F. A. Jones, Probate Judge, Toledo, Ohio, March 19, 1867.
19. In re- Private John O’Conner, a general service recruit, U. S. Army, in N. Y. Supreme Court Special Term, New York City. Opinion by Mr. Justice Dane. P. Ingraham. Repotted in N. Y. Tribune, Dec. 27, 1866.
20. In re. Emmet McDonald, in 1861, on habeas corpus, in U. S. District Court for Missouri. Opinion by Judge Treat. (IX. American Law Reg., 661.)
21. Morris v. Newton, in U. S. Circuit Court for Michigan. Opinion by Judge McLean, of U. S. Supreme Court. (5 McClean’s U. S. Circuit Court Rep., 92.) .
22. In re. Private George B. Keeler, Second Regiment U. S. Dragoons, in U. S. District Court for Arkansas, 1843. Opinion by Judge Benj. Johnson. (1 Hempstead's U. S. Rep., 306.)
23. In re. Nicholas Vciemaitre, 1851, on habeas corpus, *276 in U. S. District Court, Southern District of New York.' Opinion by Judge Andrew T. Judson. (9 N. Y. Legal Observer, May, 1851.)
24. In re. Private Michael J. Conley, IT. S. Army, on habeas corpus, in IT. S. District Court, Southern District of New York. Opinion by Judge Same. B. Betts, 1867. Beported in the N. Y. Daily Tribune, Jan. 17, 1867.
25. In re. charge to Grand Jury, IT. S. Circuit Court at New York, by Judge Same. Nelson, IT. S. Supreme Court, 1851. (1 Blatchford’s U. S. Circuit Court Rep., Appendix.)
26. The United States v. Peters. (5 Cranch’s U. S. Supreme Court Rep., 115.)
27. In re. IT. S. Marshal Sifford, in IT. S. District Court for Ohio, 1857. ' Opinion by Judge Leavitt. (5 Amer. Law Reg., 659.)
28. Ableman v. Booth, in U. S. Supreme Court. Opinion by Ch. J. Taney, for the court, at December term, 1858. (21 Howard’s Supreme Court Rep., 506.)
The case of Husted (above No. 1) is not an authority against the jurisdiction of State courts or judges.- -It appears by the report of the case, that Justices Badoliff and Kent were of opinion that the application for the writ ought to be refused on the merits of the case, as stated by the petitioner; while Justice Benson alone denied the jurisdiction. Mr. Justice Lewis and Mr. Chief Justice Lansing were for granting the writ, and were of course satisfied that the court had jurisdiction and ought to exercise it. ■ The most that can be claimed is that two judges expressed no opinion as to their jurisdiction, and "that of the other three, two decided in favor of the jurisdiction and one against it.
In connection with this case it may be properly remarked that Mr. Justice (afterwards Chancellor) Kent, in his Commentaries, vol. 1, pp. 400, 401, el sequitur, discusses this question of jurisdiction (with others of a kindred character), and that he evidently understood that the case *277 of Husted had no bearing upon the question, for he does not mention it in that connection. He refers to the case of Ferguson (9 John. Rep., 239) as a case in which the question was much discussed, but not decided, and says: “ The Supreme Court did not decide the question, and the motion was denied on other grounds; .but subsequently, in the matter of Stacy (10 John. Rep., 328), the same court exercised jurisdiction, in a similar case, by allowing and enforcing obedience to the writ of habeas corpus. The question was therefore settled in favor of a concurrent jurisdiction, in that case, and there has been a similar decision and practice by the courts of other States.”
It may also be observed that Chancellor Kent (then Chief Justice), in the first part of his opinion in the case of Ferguson, before referred to, says that in Husted’s case the court gave no opinion on the question of jurisdiction; and further, that in Stacy’s case he did not, in delivering the unanimous opinion of the court, suggest any doubt of the jurisdiction of the State Court, which jurisdiction, he after-wards stated in his Commentaries, was settled by that case.
The first edition of the first volume of the Commentaries, in which it is said that this question of the concurrent jurisdiction of State courts was settled, was published in 1826; and from that time to 1860, the jurisdiction of the State courts had never, it is believed, been denied by any State court or judge, in any. reported case. It was universally considered as settled (Hurd on Habeas Corpus, 166), and the question was probably never seriously contested in this State from 1815 to 1861. During my own service as judge, in a State court, I exercised the power of discharging minors held under invalid enlistments, in repeated instances, and without the jurisdiction being questioned; and I well know that the same authority was frequently exercised by other State courts and judges. In most of these instances not even a newspaper notice of the. case was ever published.
*278 In Commonwealth v. Fox (7 Barr’s Rep., 336), Mr. Justice Coulter, in 1847, declared that “ In Pennsylvania, the jurisdiction of State judges and State courts has not before been doubted; and from the case of Commonwealth v. Murray (4 Binney, 487),” [decided in 1812,] “ down to the present time, numerous cases have occurred in which it has been exercised, some of them reported, and many more unreported.”
In Massachusetts, the jurisdiction was continually exercised, from 1814 down to 1861, as .is apparent from the reported cases; and it is not doubted that many hundreds of minors were discharged from the army, under every administration of the War Department, and during every year, from 1814 to 1860; and yet there is no reason for believing that any opinion of the Attorney General of the United States, adverse to the exercise of this jurisdiction-, was ever obtained, or that any officer of the United States ever disregarded a- discharge made by a State court or judge, on the ground that it was utterly void—as it was, if there was an absolute want of jurisdiction. On the contrary, on the 9th of September, 1853, Mr. Attorney-General Cushing, in an official opinion furnished to the Secretary of the Treasury of the United States, declared that “ the question of jurisdiction, as applied to enlistments in the army or navy of the* United States, was definitively settled, so far as a long series of decisions of the States can go, in favor of the jurisdiction of the courts of the States.” (Opinions of Attorney-Generals of the United States, vol. 6, pp. 103, 106.)
Indeed, it may be said that this jurisdiction was, for a quarter of a century, tacitly conceded by the general government; for it is quite certain that during the period of more than thirty years, in which .this jurisdiction was constantly exercised by State courts and judges, no single case was ever taken to the Supreme Court of the United States for the purpose of reversing, on the ground of a *279 want of jurisdiction, any decision of a State court or judge discharging a minor or other person from the army because he was held only under an illegal or void enlistment.
The following cases, in which State courts and judges have exercised jurisdiction, are only a few of the very great number of cases in which that jurisdiction has been maintained; only a very small proportion of such cases having been reported, unless some important question other than that of jurisdiction was discussed:
In Georgia, in 1808, The State v. Wederstrandt (T. U. P. Charlton’s Rep., 2, 3); in Pennsylvania, in 1809, ex parte Sergeant (8 Hall’s Law Journal, 206); same case as Olmsted’s case (Brightley’s Rep., 9); in 1812, Com,, v. Murray (4 Binney’s Rep., 487); in New York, in 1813, Matter of Stacy (10 John. Rep., 328); in Pennsylvania, the same year, Lockinton’s case (Brightley’s Rep., 269); in Massachusetts, in 1814, Com. v. Cushing (11 Mass. Rep., 67); Com. v. Harrison (ibid, 63); Com. v. Chandler (ibid, 83); in Pennsylvania, in 1815, Corn. v. Robinson (1 Serg. and Rawle, 353); in New York, in 1816, Matter of Stephen (1 Wheeler’s Criminal Cases, 323); in New Jersey, in 1819, State v. Brearly (2 Southard’s Rep,, 555); in New York, the same year, Matter of Wilson (4 City Hall Recorder, 57); in Maryland, the same year, ex parte Joseph Almeida (2 Wheeler’s Criminnl Cases, 576); in Virginia, in 1821, ex parte Poole and others (National Intelligencer, Nov. 10 and Dec. 11, 1821); in New York, in 1827, Matter of Carlton (7 Cowen’s Rep., 471); in Virginia, in 1834, in Pleasant’s case (11 American Jurist. 257); in Massachusetts, in 1836, Com. v. Downes (24 Pickering, 227); Com. v. Aves (18 Pickering, 193); in Massachusetts, in 1841, Com. v. Taylor (3 Metcalf. 72, and 4 Boston Law Repr., 274); in New Hampshire, the same year, The State v. Dimmick (12 N H. Rep., 194); in New York, in 1843, Matter of Sullivan and Van Velsor (1 N. Y. Legal Observer, 314); United *280 States v. Wingall (5 Hill’s Rep.. 16); in Massachusetts, in 1844, Lucas’ case (67th vol. Niles’ Register, 114); in 1847, cases of Kimball, Moore & Stone (9 Boston Law Rep., 500); Rowe's case (ibid, 510); Kinniston’s case (ibid, 548); in Pennsylvania, Corn. y. Fox (7 Barr’s Rep., 336); in Illinois, the same year, case of Jane, a woman of color, and her four children, claimed as slaves by a citizen of Kentucky, in which case the late President Lincoln was counsel for the master (Niles’ Register, vol. 73, p. 274); in Virginia, Com. v. Archer (9 Boston Law Repr., 465); in New York, Matter of Belt (1 Barker’s Criminal Rep., 169); in Massachusetts, in 1851, Sim’s case (7 Cushing’s Rep., 285); in Ohio, in 1858, Collier’s case (6 Ohio State Rep. 55); in 1859, ex parte Bushnell (9 Ohio State Rep., 17); in Massachusetts, in 1860, Sanborn’s case (22 Boston Law Repr., 730, and 23 do., 7, 8, 20.
Most of the following are later cases, viz:
Dobb’s case (9 American Law Reg., 565); Phelan’s case (9 Abbott’s Prac. Rep., 286); Lew’s case (25 Boston Law Repr., 15 New Series, 53); Com. v. Biddle (Penn. Law Journal, vol. 6, New Series vol. 1, 287); Kemp’s case, before the Supreme Court of Wisconsin, in January, 1863; The People v. Gaul, 1865 (44 Barbour’s Rep., 44); Matter of Barrett (42 do., 479); Matter of Beswick (25 Howard’s Practice Rep., 149); Martin's case (45 Barbour, 143); Com. v. Holloway (5 Binney’s Rep., 512); Ohio R. R. Co. v. Fitch (20 Indiana Rep., 498); Skeen v. Monkeemen (21 Indiana Rep., 1); ex rel. Cozzens v. Frink (13 Amer. Law Reg., 700); cases of Sullivan and Van Velsor (1 N. Y. Legal Observer, 314); and, as bearing upon this question of jurisdiction, see Williamson v. Berry (8 Howard's U. S. Rep., 540); Williamson v. Mackenzie (7 Hill’s N. Y. Rep., 95, and cases there cited); Williamson's case (3 Amer. Law Reg., 741); ex parte Williamson (4 do., 27); Flliol v. Pearsol (1 Peters, 328, 340); Teal v. Fulton (1 Comstock’s N. Y.Rep., 537, and 12 Howard’s Rep., 284); Delafield v. *281 Illinois (2 Hill 159); Com. v. Robinson (1 Serg. and Rawle, 353); Smith v. Shaw (12 John. Rep., 257); and Houston v. Moore (5 Wheaton’s Rep., 1).
An examination of these eases will show that in some of them, generally the earliest cases in each State, the jurisdiction of the State tribunals is maintained by elaborate and entirely conclusive arguments, while in most of them the jurisdiction is assumed as though it was no longer open to discussion. Of those in which the question of jurisdiction was discussed at some length, the following cases are among those deemed most accessible to the profession:
Olmsted’s case (Brightley’s Rep., 9); Lockington’s case (id., 269); Com. v. Murray (4 Binney, 487); Com. ex rel. Webster v. Fox (7 Barr’s Rep., 336): State v. Brearly (2 Southard, 555); State v. Dimmick (New Hamp. Rep., 197).
The case of Ferguson (No. 3), though before the full bench, is very far from being a case in which the jurisdiction was denied by all the judges. Mr. Chief Justice Kent did indeed express an opinion against it; but Justices Spencer, Thompson, Van Ness and Yates were careful to reserve the expression of an opinion upon that question. The opinion of Mr. Justice Kent could not have been the result of careful research, or much deliberation; for he expressly states that the only case he had met with in which the question had been considered was that of Emanuel Roberts; and it has been shown that in the case of Stacy, decided in 1813, he (as well as the other four judges who sat in the case of Ferguson) upheld the jurisdiction with a firm hand. And they did not hesitate to order an attachment against Morgan Lewis, General of Division in the Army of the United States, for making an evasive return, in contempt of the writ of habeas corpus issued by a commissioner of the court.
In the case of Sims (No. 4), the jurisdiction of State courts and judges was not denied. The case was heard *282 before Chief Justice Shaw, of Massachusetts and his associates, Fletcher and Bigelow. The Chief Justice delivered the opinion of the court, and instead of declaring that the court had no jurisdiction, he argued at great length to show that the Fugitive Slave Law was constitutional, and that the petitioner was lawfully held by virtue of legal process issued under it; and to exclude the possible inference that the jurisdiction of the State court was denied or doubted, he said: “We do not mean to say that this court will in no case issue a writ of habeas corpus to bring in a party held under color of process from the courts of the United States, or persons whose services, and the custody of whose persons, are claimed under authority derived from the laws of the United States. This is constantly done in cases of soldiers and sailors, held by military and naval officers, under enlistments complained of as illegal and void.”
The case in Butcher's Reports (No. 5) is one in which, as I understand it, the petitioner, a minor, had enlisted and actually entered the army, and had then deserted; and the correctness of the decision in that case, and in others that have been cited, may, therefore, be maintained upon principles which will hereafter be considered, but-which have no application in the case of a petitioner who has never, in fact, been in the land or naval forces of the United States.
In the case of Welch, before Judge Ogden (No. 6), and in the case of Spangler (No. 7), I understand the jurisdiction' of the State court was denied, although the latter case was heard on the merits, and was in fact decided upon the ground that the party was illegally held, as well as upon the ground of the want of jurisdiction.
The cases of Jordan, before Judge Smith (No. 9) and of Hopson, before Judge Bacon (No. 8), deny the jurisdiction; but the authority of the latter case is no greater than that of Bailey's case, decided about the same time by *283 fudge Mullin, the colleague of Judge Bacon, and in which the jurisdiction was maintained in an elaborate and able opinion.
Cases Nos. 10, 11 and 12, before Judge Barnard, No. 13, before Judge Bussell, No. 14, before the Becorder's Court in Charleston, in 1862, and Nos. 17, 18, 19 and 24, I have not had an opportunity to examine, and they may, for aught I know, deny the jurisdiction of State courts and judges, in cases of this character. But if they do, I cannot but think that cases decided at Chambers, under a press of business which precludes laborious reseach or careful deliberation upon the authorities, and which are reported, perhaps mistakenly, only in a newspaper, should have little weight as authority, against the cases which have been deliberately considered and decided by judges of the highest.rank and authority, and whose learning and ability have not been excelled by any of the judges of their respective States.
The case of Reynolds, alias Sloan, before Judge Lamont (No. 16), is the case of this petitioner. The' proceedings in that case are now before' me, having been .made a part of the return in this case, and these proceedings show that the jurisdiction was not denied, but was in fact asserted and maintained. The citation of this case, as one denying the jurisdiction, forces me to the conclusion that the printed portion of the brief before alluded to was not prepared by the learned and courteous young gentleman by whom it was forwarded; and that it was made up and printed for use before other tribunals rather than this; for it is not believed that this gentleman has presumed so far upon the ignorance or indolence of the presiding judge of this court as to suppose that, with the record before him, he would regard the case before Judge Lamont as an authority against the jurisdiction of State courts and judges.
In the case of Keeler (No. 22),. the jurisdiction was *284 questioned, though not denied; and the opinion expressed by Judge Judson, in the case of Veremaitre (No. 23), was avowedly based upon the opinion of Chief Justice Kent, in Ferguson’s case, which Judge Judson erroneously assumed had the concurrence of Mr. Justice Thompson, and, overlooking the case of Stacy, and many similar cases, as well as the statement of Chancellor Kent in his Commentaries, he erroneously and very strangely declared the authority of Chief Justice Kent’s opinion in Ferguson’s case remained unshaken! In view of these facts, and the additional fact that this case of Veremaitre has, during the present month, been deliberately overruled by Judge Shipman, with the concurrence of Mr. Justice Nelson and Judge Blatchford (see New.York Tribune of Friday, June 14, 1867, which gives Judge Shipman’s opinion in full), this decision of Judge Judson may be considered as no very high authority upon the question of jurisdiction.
The case of McDonald (No. 20), and the case in the bih Oranch (No. 26), have been hastily examined without finding- therein anything which justifies the citation of either as an authority against the jurisdiction of State courts and judges.
Sifford’s case (No. 27) may properly be cited as containing dicta opposed to the jurisdiction, although the case was in no respect like this.
Before proceeding to examine other cases cited in support of the point now under consideration, it may be well to remark that in many of the cases cited against the jurisdiction of State courts and judges, the question was not necessarily determined as the petitioner or other party detained was decided to be legally held in custody; that in others they were held as deserters by reason of their having deserted whilst actually in service under an illegal or merely voidable contract of enlistment; and that in others the term jurisdiction has been loosely used, and its existence in the particular case apparently denied when it *285 is quite-certain that jurisdiction would have been exercised and the prisoner discharged if the authority under which he was held had not been deemed valid and legal. And it is believed that some of the cases most frequently relied upon as denying the jurisdiction will not, when carefully examined, and after the language of the judges has been deliberately considered in connection with the actual facts of the case, appear to deny the jurisdiction to discharge if legal authority to detain is not shown, or be deemed of much weight when compared with many of the numerous cases in which the jurisdiction has been maintained.
In the case of the State v. Phine and Vessel (T. U. P. Charlton’s Rep., 142), which has been sometimes cited in opposition to the jurisdiction, it appeared by the return to the habeas corpus .that the prisoners (two seamen) had been committed for desertion from their respective vessels, by a justice of the peace, pursuant to an act of Congress. The court said: “ The proceedings of the justice appear to be regular under this act; and though this court hath not denied the benefit of the writ of habeas corpus, yet it is conceived that it possesses no jurisdiction in the present case. The powers given to the justice and master are derived from the law of the United States, and whether exercised properly or improperly, by the one or the other, is not a subject for the investigation of this court.”
All this is consistent with the exercise of jurisdiction, and the requirement of proof that the detention is lawful, and would not have prevented the discharge of the seamen if the proceedings against them had not been authorized by the act; but the court said they were so authorized, and that they appeared to be regular. And neither a State nor a United States judge would have jurisdiction (in the sense in which this word is frequently used, as synonymous with the legal and rightful exercise of judicial authority) to discharge under such circumstances; for the reason that it is well settled that 'a writ of habeas *286 corpus can never be used as a certiorari or writ of error for the review and reversal of the adjudication of an inferior tribunal, when that tribunal has jurisdiction and its proceedings are not void, but legal and regular on their face. (The People v. Cassells, 5 Hill’s Rep., 164; The People v. Cavanagh, 2 Parker’s Crim. Rep., 650; Com. v. Keepers of Debtors' Apartment, 1 Ashmead’s Penn. Rep., 10; Com. v. Lecky, 1 Watts’ Penn. Rep., 68.)
In the case of Rhodes- (Ho. 14), in South Carolina (2 Wheeler’s Crim. Cases, 559; Niles’ Weekly Register, vol. 12, 264), the question presented was, in principle, much like that presented in the case of The State v. Phine, in Georgia. Rhodes had been committed, and was detained for trial in the courts of the United States, in virtue of a warrant of commitment under the hand and seal of a justice of the peace of South Carolina, on a charge that the prisoner had forged or counterfeited a number of protections for American seamen. This, the judge held, was no offense against the laws of South Carolina, but was an offense against the laws of the United States; and {as his opinion states) he was called upon, on the return of the writ of habeas corpus, to discharge Rhodes from custody on the ground that the warrant contained no accusation under the laws of the State, and that the magistrate who committed him, being only an officer of the State,' had no authority to commit him for an offense against the United States—it being contended that the thirty-third section of the judiciary act of the United States of 1789, which in terms authorizes such commitments, was unconstitutional and void.
The judge discussed the question thus raised at length, and with great ability; and he decided that the thirty-third section of the act of 1789, which authorizes justices of the peace to commit for trial persons properly charged before them with criminal offenses against the laws of the United States is constitutional; and, as there was no other pre *287 tense that the warrant of commitment was irregular or insufficient, he refused to discharge the prisoner. He was, in fact, held to he legally in custody to await his trial for an offense which was triable in the United States courts alone; and, as the question of his guilt or innocence could only be legally determined on a trial in those courts, the judge very properly decided he had no lawful right to discharge him, on habeas corpus, on the grounds alleged. A judge of the United States court would have made the same decision. It is true the judge declared that, under the circumstances of that case, he had no jurisdiction. If by this he intended only to say that he had no lawful authority to discharge, he was correct; and it does not satisfactorily appear from his opinion that he would have denied his jurisdiction if he had held that the justice who issued the warrant was not authorized by law to commit the prisoner and cause him to be detained for trial. On the contrary, his elaborate argument to prove the authority of "the justice, is evidence that if he had decided that the justice had no such authority the prisoner would have been discharged.
. The case of Emanuel Roberts (No. 2), in Maryland (2 Hall’s Law Journal, 192), is also cited against the jurisdiction; but the jurisdiction to make inquiry and require proof of the legality of the detention was not in express terms denied. On the contrary, I think it was substantially asserted. It was the case of an enlistment; and Judge Nicholson, who decided that case, in the commencement of his opinion said: “The petition upon which the habeas corpus issued in this case contained a statement of facts, certified upon oath, extremely different from those which have appeared in evidence. The petition stated that Emanuel Roberts, the son of the petitioner, had been seized and forcibly carried on board the brig Syren, commanded by Capt. Gordon, and lying in the basin of Baltimore, where he had been detained since the 10th of April. *288 The statement detailed so gross a violation of the law, and intimated to the court something so extremely like impressment, that no hesitation was felt in granting a writ, which ’ every citizen illegally held in custody has a right to demand. If the facts as stated in the petition had been supported by evidence, the party detained must have been discharged, whether the detention had been by officers of the United States or others, and I would most certainly have held them to bail to answer upon a criminal prosecution.” And in another part of his opinion he said: “ The power of the court to examine into the regularity of the proceeding is only contended for on the ground that the citizens of the State are entitled to its protection; that the writ of habeas corpus is all important to secure the liberty of the citizen; and that every man may claim relief under it. These positions cannot be denied, and might apply very forcibly to the case under consideration if there was no contract or agreement to service in question.” Again he said: “An extreme case has been supposed, in which I acknowledge that I would interfere without hesitation. It is asked if a child of eight or ten years of age had been enlisted, would the court refuse to discharge him? I answer, No; I would discharge him because of his incapacity to make a contract. If in such a case I should exceed the technical limits of my authority, I should have the approbation of all good men for resisting oppression under the color of law.”
It is true that there is a portion of the opinion which apparently denies the judge’s jurisdiction; but if this is to be taken as, a denial of his jurisdiction to inquire into the cause of detention, and to discharge if the imprisonment was illegal, there is reason to doubt the perfect accuracy of the report; for a judge must have very confused ideas of a question of jurisdiction, and of his duty, who determines that he has or has not jurisdiction as he may or may not regard the case before him as an extreme one; who decides that he has jurisdiction in a case when h<? *289 determines to adjudge a contract void because of an incapacity to contract, and that he has no jurisdiction when he adjudges it void because it was made in violation of law; or who considers it to be a sufficient and proper excuse for deciding contrary to the convictions of his judgment, upon a question of jurisdiction or other question of law, that he should thereby gain the approbation of others.
Besides, Judge Níoholson, in this same opinion, states that he had not only taken jurisdiction, but had discharged the parties, in case of Adair and Ogden, who, he says, “ had been arrested by Gen. Wilkeson, in New Orleans, on a suspicion of being connected with Burr in certain treasonable practices, and who were confined in Fort McHenry to await the order of the Secretary of War.” In short, he appears, in his opinion in the case of Boberts, to have taken jurisdiction and discharged when he thought proper to discharge; and to have refused to discharge, suggesting a want of jurisdiction as the grounds of such refusal, when he thought a discharge ought not to be granted, in case he had jurisdiction. Surely the case is no authority against the jurisdiction, for in this case, as well as in the case of Adair and Ogden, he seems to have decided, not a question of strict jurisdiction, but simply one of judicial duty, and to have used the term jurisdiction in the sense of the rightful and legal exercise of judicial authority to discharge the petitioner; and it is in this sense that it has been frequently used when the jurisdiction has been denied.
These three cases, decided in Maryland, Georgia and South Carolina, have been more than once cited as denying the jurisdiction of the State courts and judges; but a careful examination of them will, it is believed, show that they should have very little weight as against the jurisdiction of State courts and judges to require proof of the legality of a detention under pretense of the national authority. They are certainly decisions against the power *290 to discharge the prisoners in the particular cases then under discussion; but the question of jurisdiction was not necessarily decided in either, because, in each, the prisoners were decided to be legally held in custody. In fact, these cases, with the exception of that of Roberts, were cases where the prisoners were decided to be legally committed, by regular process, for offenses against the laws of the United States; and in the case of Roberts he was decided to be legally held to service by a valid contract of enlistment. And it is deemed quite certain that in each of these cases the petitioner would have been discharged if it had appeared that he was unlawfally detained.
The cases of the United States v. Booth and of Ableman v. Booth (21 Howard, 506), and the opinion of Mr. Chief Justice Taney, in those cases, deserves more consideration; but, before examining these cases one or two other authorities will be considered.
Mr. Justice Nelson’s charge to the grand jury, at New York, in 1851 (No. 25), has been cited, at different times, as denying the jurisdiction of State courts and judges to inquire ■ into alleged unlawful imprisonments under pretense of the authority of the United States, but. it is believed that'this charge of Mr. Justice Nelson does not deny the jurisdiction of State courts or judges when such imprisonment is unlawfill.
He expressly excludes the inference of such a denial, for he says (1 Blatchford C. C. Rep., 635): “ It is proper to say, in order to guard against misconstruction, that I do not claim that the mere fact of the commitment or detainer of a prisoner by an officer of the Federal Government bars the issuing of the writ, or the exercise of power under it. Far from that. Those officers may be guilty of illegal restraints of the liberty of the citizens, the same as others.
“ The right op the State authorities to inquire into SUCH RESTRAINTS IS NOT DOUBTED; and it ÍS the DUTY of *291 the officer to obey the authority by making a return. All that is claimed or contended for is that when it is shown that the commitment or detainer is under ” [not simply alleged to be under] “ the Constitution, or a law of the United States, or a treaty, the power of the State authority .is at an end, and any further proceeding under the writ is coram non judice and void.
“ In such a case, that is, when the prisoner is in fact held under process issued from a Federal tribunal under the Constitution, or a law of the United States, or a treaty, it is the duty of the officer not to give him up or allow him to pass from his hands in any stage of the proceedings.”
In other words, if the party is held under a proper warrant, issued under the authority of the United States, the United States courts alone have the right to proceed and determine the questions which are properly to be determined in the case commenced by the arrest of the party, under the laws of the United States; and it is only when it is shown, in the due course of judicial inquiry, that the party is lawfully held under the laws of the United States that the powers of the State court or judge, are at an end.
In the case of Norris v. Newton [No. 21] (5 McLean’s Rep., 92),. cited' as denying the jurisdiction of State officers, Judge McLean took substantially the same ground; although there may be portions of his opinion which, standing alone, might indicate a denial of jurisdiction.
“ I have no hesitation,” says he, “in saying that the judicial officers 'of a State, under its own laws, in a case where an unlawful imprisonment is shown by one or more affidavits, may issue a writ of habeas corpus to inquire into the cause of detention. But this is a special and limited jurisdiction.
“If the plaintiff, in the recapture of his fugitive slaves, had proceeded under the act of Congress, and made proof of his claim, before some judicial officer in Michi *292 gan, and procured the certificate which authorized him to take the fugitive to Kentucky, these facts, being stated as the cause of detention, would have terminated the jurisdiction of the judge under the writ. Thus it ivould appear that the negroes were held under Federal authority, which in this respect is paramount to that of the State. The cause of detention Toeing legal, no judge could arrest and reverse the remedial proceedings of the master.”
All this is entirely consistent with the jurisdiction of the State court to inquire into the legality of the imprisonment of the party, until it is shown that he is legally held under the authority of the United States, and consistent also with the rightful exercise of the authority of the State court to discharge him, if the legality of the detention is not established.
In the case supposed by Mr. Justice McLean, a United States judge would not be justified in reversing, on habeas corpus, the decision of the certifying officer, if all Ms proceedings appeared to be regular and proper on their face; for an act of Congress having given the certifying officer the authority and jurisdiction to adjudicate the questions arising upon the application for his certificate, and also declared that such certificate “ should Toe a sufficient warrant for removing the said fugitive from labor to the State or territory from which he or she fled ” (Act of 1793, 1 U. S. Statutes at Large, 302, sec. 3), no judge of the United States court, while that law was in force, could, on habeas corpus, have reversed the adjudications of the certifying officer, if such adjudications were certified in due form; but could only discharge because such certificate of adjudication was informal, defective or irregular, and therefore insufficient upon its face to justify the detention of the party. (People v. Cassels, and People v. Cavanaugh, ubi supra.)
Perhaps the decision of the certifying officer might have been reviewed by the circmt on certiorari, but on this question I express no opinion.
*293 Mr. Justice McLean, in the case of Norris v. Newton, held that the plaintiff, “having legally arrested his slave,” [as. the Supreme Court of the United States has decided, in the case of Prigg v. Pennsylvania, he might then lawfully do], “and having returned the fact of such arrest and that they were fugives and his slaves, and these facts showing that the fugitives were in legal custody being admitted, the State judge could exercise no further jurisdiction in the case.” This, and his reasons for such decision, will appear from the following extracts from his opinion.
In the sentence immediately following the extract above given, and in speaking of the proceedings on habeas corpus before the State judge, Judge McLean said, “and the return made by the plaintiff, being clearly within the provisions of the Constitution, as decided in the case of Prigg v. The State of Pennsylvania, and the facts of that return being admitted by the counsel for the negroes, the judge could exercise no further jurisdiction in the case. His power was at an end. The fugitives were in the legal custody of their master—a custody authorized by the Constitution and sanctioned by the Supreme Court of the Union. If the facts on the return of the habeas corpus had been denied, it would have been incumbent on the master to prove them, and that would have terminated the power of the judge. Had the Legislature of Indiana provided by express enactment that in such case the judge should discharge the fugitives, the act would have been void. No procedure under it could be justified or excused. And in the case under consideration, the custody of the master being admitted to be under an authority paramount to that of the Slate, the discharge of the fugitives by the judge was void, and, consequently, can give no protection to those who acted under it.
“No judge of the United States can release any one from a custody under the authority of a State. Some years since an individual was indicted in the Circuit Court *294 of the United States for the First Circuit, if I mistake not, for a capital offense. The defendant was ascertained to be imprisoned for debt, under State process; and the lamented Mr. Justice Story very properly held that he had no power to release him from that custody by habeas corpus. The authority of the plaintiff to arrest and hold in custody his slaves, under the decision in the case of Prigg, was as unquestionable as could be that of any officer acting under judicial process. If the master in the return to the habeas corpus, or in bus proof, the return BEING DENIED, SHOULD FAIL TO SHOW HIS RIGHT to the Service of the fugitive, the State judge would have the POWER TO DISCHARGE THEM PROM HIS CUSTODY. He might again arrest the fugitives and, by additional evidence, establish his right to their services.
“ This would be consistent with the dignity of a State, and enable it to give protection to all who are within its jurisdiction, and are entitled to its protection; while at the same time it could not impair the rights of the master. It imposes on him no hardship. When he undertakes to recapture his slaves, under the highest authority known to the country, he must be prepared to show, if legally required to do so, that he is exercising a rightful remedy. This remedy, being by the mere act of the party, and without any exhibition or judicial sanction, must be subject to the police power of the State, at least so far as to protect the innocent from outrage.”
- These extracts from Mr. Justice McLean’s opinion are deemed sufficient' to show that he certainly did not deny the jurisdiction of State courts and judges to discharge parties illegally detained under pretense of the authority of the United States; and to show, on the contrary, that he expressly affirmed the right of the State court to discharge a fugitive slave, even when the detention was in fact lawful, unless the legal authority for such detention toas shown.
*295 The cases of Ableman v. Booth and The United States v. Booth, decided together and reported together in 21 Howard's Rep., 506, remain to be .considered.
Since these cases were first reported they have always been most relied upon by those who have denied the rightful authority and jurisdiction of State courts and judges in enlistment cases. Indeed, it could hardly be otherwise; for without the grounds for argument which these cases furnish, the denial of jurisdiction might well be deemed unworthy of a moment’s consideration. As cases decided by the court of the last resort, and as the only apparent justification for the decisions made within the last seven years denying the. jurisdiction under consideration, these cases and the opinion delivered therein by Mr. Chief Justice Takey, require a very careful and deliberate examination. It must, however, be apparent that these cases did not necessarily require the decision of the question now under discussion, for they were brought up by a writ of error prosecuted for the purpose of reversing the decisions and judgments of the Supreme Court of Wisconsin, declaring that Booth was illegally imprisoned and ordering his discharge. The facts showing that Booth was legally detained in custody under the laws of the United States, as expounded by the Supreme Court at Washington, were fully proved or admitted before the court of Wisconsin, and, therefore, there was no question before the court at Washington in regard to the jurisdiction, authority or duty of a State court or judge, in a case where there .was no proof of the legality of the detention. For these reasons the case of Ableman v. Booth is not a binding authority upon the question now under consideration.
Nevertheless, the. paramount authority of the court, the purity, learning and wisdom of Chief Justice Takey and his associates, entitle the opinion of the court in Booth’s case to the highest consideration and respect; and if it had declared in express and unmistakable language that *296 State courts and judges had no jurisdiction to inquire into the legality of the detention of a person alleged to be lawfully held as an enlisted soldier, I should certainly feel that I ought not to disregard it.
But waiving, for the purposes of this examination, the consideration that the alleged opinion of the chief justice, so far as it is applicable to the present question, is a mere obiter dictum, and, therefore, not a binding authority, I shall proceed to consider what conclusions in regard to the opinions then entertained upon the question of jurisdiction may be properly drawn from the opinion delivered by the chief justice.
The language of the chief justice must be considered in connection with the acknowledged facts of the case then under consideration, and must be understood to have reference, mainly, to cases of a similar character. The decision of the Wisconsin court, which declared the Fugitive Slave Act unconstitutional and void, was in direct conflict with repeated and well-known decisions of the Supreme Court of the United States, and with decisions of many State courts of eminent learning and of the highest authority; and it was unsupported by a single prior decision of the Supreme or Superior Court of any State. The act had been passed by the two.Houses of Congress, and approved by the President, as one of a series of measures of compromise and peace; and an act involving the same constitutional question, and with the same general features, had been passed by Congress in 1793, and had received the constitutional approval and sanction of President Washington. The chief justice therefore regarded the decision of the Wisconsin court as a gross and' wanton violation of the Constitution and laws of the United States, and as an unjustifiable and outrageous denial of rights secured by that Constitution, and in respect to which the’chief justice, in common with nearly the entire white population of the Southern States, was then peculiarly sensitive. He, there *297 fore, used earnest and strong language, and he probably did not always stop to consider whether it should not be restricted in its application to other cases.
But this language, even when abstractly considered, does not deny the jurisdiction of the State court or judge, upon a mere claim or assertion, by return or otherwise, that the party on whose behalf the writ of habeas corpus has been issued is held by an officer of the United States, and under its authority. It must, according to Judge Taney, he true, as matter of fast and law, “ that the party is in custody under the authority of the United States,” not merely under pretense of authority; and he says the State “court or judge has the right to inquire in this mode of proceeding [that is under the habeas corpus] for what cause and by what authority the prisoner is confined within the territorial limits of the State sovereignty. And it is the duty of the marshal, or other person having the custody of the prisoner, to make known to the judge or court, hy a proper return, the authority by which he holds him in custody.” That portion of the opinion of Chief Justice Taney which is supposed to indicate his views upon the question under discussion is as follows:
“In the case before the Supreme Court of Wisconsin a right was claimed under the Constitution and laws of the United States, and the decision was against the right claimed; and it refuses obedience to the writ of error, and regards its own judgment as final. It has not only reversed and canceled the judgment of the District Court of the United States, but it has reversed and annulled the provisions of the Constitution itself, and the act of Congress of 1789, and made the superior and appellate tribubunal the inferior and subordinate one.
“We do not question the authority of the State court or judge, who is authorized by the laws of the State to issue the writ of habeas corpus, to issue it in any case where the party is imprisoned within its territorial limits, provided it *298 does not appear, when the application is made, that the person imprisoned is in custody under the authority of the United States. The court or judge has a right to inquire, in this mode of proceeding, for what cause, and by what authority, the prisoner is confined within the territorial limits of the State sovereignty. And it is the duty of the marshal, or other proper person having the custody of the prisoner, to make known to the judge or court, by proper return, the authority by which he holds him in custody.
“This right to inquire by process of habeas corpus, and the duty of the officer to make a return, grows necessarily out of the complex character of our government, and the existence of two distinct and separate sovereignties within the same territorial space, each of them restricted in its powers, and each, within its sphere of action prescribed by the Constitution of the United States, independent of the other. But after the return is made, and the State judge or court judicially apprised that the party is in custody under the authority of the United States, they can proceed no further. They then lenow that the prisoner is within the dominion and jurisdiction of another government, and that neither the writ, of habeas corpus nor any other process issued under the State authority, can pass over the line of division between the two sovereignties. He is then within the dominion and exclusive jurisdiction of the United States. If he has committed an offense against their laws, their tribunals alone can punish him. If he is wrongfully imprisoned, their judicial tribunals can release him and afford him redress. And although, as we have said, it is the duty of the marshal, or other person holding him, to make known by a proper return the authority under which he detains him, it is at the same time imperatively his duty to obey the process of the United States, to hold the prisoner in custody under it, and to refuse obedience to the mandate or process of any other *299 government.. And consequently it is Ms duty not to take the prisoner, nor offer Mm to be taken, before a State judge or court upon a habeas corpus issued under State authority. No State judge or court, after they are judicially informed that the party is imprisoned under the authority of the United States, has any right to interfere with him, or to require Mm to be brought before them.. And if the authority of a State, in the form of judicial process or otherwise, should attempt to control the marshal or other authorized officer or agent of the Umted States, in any respect, in the custody of. his prisoner, it would be his duty to resist it, and to call to his aid any force that might be necessary to maintain the authority of law against illegal interference. No judicial process, whatever form it may assume, can • have any lawful authority outside of the limits of the jurisdiction of the court or judge by wMch it is issued, and an attempt to enforce it beyond these boundaries is nothing less than lawful violence.”
From these extracts it will be seen that the authority of the State court or judge to issue the writ is not questioned by CMef Justice Taney, “provided it does not appear, when the application is made, that the person imprisoned is in custody under the authority of the Umted States.” This is not only in accordance with the views of Judges Nelson and McLean, as above given, but it is also substantially in accordance with the provisions of the New York Eevised Statutes. These statutes, wMch were prepared by the ablest lawyers of the State, and passed by a Legislature contaimng many eminent members of the bar, require our courts and judges to grant the writ of habeas corpus to all persons restrained of their liberty, under any pretense whatever, unless they be detained:
1. By virtue of process from any court or judge of the United States having exclusive jurisdiction in the case; or (2) by virtue of the final judgment or decree, or execution thereon, of any competent tribunal of civil or criminal *300 jurisdiction, other than in the case of a commitment for any alleged contempt; and the parties are required to be remanded in cases where the authority to detain is claimed under the laws of the United States, without further inquiry into the legality of their detention, only when it is shown that they are detained by virtue of process issued by a court or judge of the United States in a case where such court or judge has exclusive jurisdiction. These statutes were intended to define, and it. is believed do ■properly define, with due legal precision, the legal duty of State courts and judges in such cases.
In considering his opinion it must be remembered that Mr. Chief Justice Taney is speaking as a judge, and that when he speaks of a person being in custody under the authority of the United States he means legally in such custody, under and in pursuance of the laws of the United States. He does not say under the authority of a department or officer of the United States, but under the authority of the United States; and that authority can only be given by the Constitution and the laws of the Union. It is expressly conceded by Chief Justice Taney, that the State court or judge has a right to inquire for what cause and by what authority the prisoner is confined, and the exercise of such right to inquire is clearly the exercise of jurisdiction. And if he has such right to inquire, it must also be conceded that he has the right to make that inquiry in the usual mode of judicial proceedings, and as the basis of judicial action; and to discharge the prisoner if it be ascertained upon such inquiry that he is not lawfully held in custody. It is also expressly conceded that it is the duty of the marshal or other person to maie known to the judge or court by a proper return the authority by which he holds the prisoner in custody; and it is clear that there can be no duty to make a return unless the court or judge has jurisdiction to require it. To concede the right of the State judge to require, and the duty of the United States *301 officer to make a return, is but idle mockery—a hollow and false pretense of respect for the judicial authority of the States—unless the right to discharge exists when the detention is illegal. It is also said by the chief justice that “ after the return is made, and the State judge or court is judicially apprised that the party is in custody under the authority of the United States, they can proceed no further;” in other words, he cannot then discharge the prisoner. He concedes that. a return is to be made, and that the judge or officer must in addition be judicially apprised of the' facts, which terminate his jurisdiction. But how judicially apprised 9 Clearly, by legal proof of those facts, if the return is traversed or denied; for a judge ór court, as such, and in respect to the facts in controversy in such cases, can know nothing judicially, can be judicially apprised or judicially informed of nothing, except by the admissions of the parties, or by legal proof, in the due course of legal proceedings. Until so judicially informed or apprised, the jurisdiction is not questioned by the chief justice. And if it were not intended to indicate that this should be done in legal form, by due proof in the regular course of judicial proceedings, why was a proper formal return required, and the term judicially used and repeated in this connection? It could be for no other purpose than to show that the facts must be established in such legal manner as to make them proper subjects of judicial cognizance and action, for the term judicially requires it to be done “in a judicial manner,” or “ in legal form;” and it is possible that in the selection of the term “ apprised” the chief justice had in mind the technical definition of that word when derived from the French apprise, and meaning the ordinance by which the sentence of a superior judge is declared to an inferior. (Webster's Dictionary, folio, Springfield, 1865.) Considering "the language of Chief Justice Taney, in connection with the facts in the case then before him, it can scarcely be doubted that *302 he must be understood to mean that until the person who holds the prisoner in custody exhibits the authority under which he holds him, and proves that such authority is, in fact and law, the authority of the United States, in other words, proves the facts upon which such authority rests, if such facts are denied, the jurisdiction, authority and power of the State court or judge are unquestionable; and it is believed that if the Supreme Court of the United States had intended to overrule the numerous cases hereinbefore cited (decided by the most learned and eminent judges of the different States, and of the existence of which that court could not have been ignorant), and to strike down by a single blow a jurisdiction which had been uninterruptedly exercised by State courts and judges for more than thirty years, the chief justice would have expressed that intention in distinct terms; and would have given these cases a passing notice and expressly disapproved their doctrines, if he had not attempted to maintain their unsoundness by opposing arguments.
Most of the considerations which lead to the conclusion that the chief justice intended by the terms judicially apprised and judicially informed to indicate the material allegations of the return (which he declares must be made) shall, if denied, be established by legal proof, have been stated; but in addition to these and to the consequences of adopting and acting upon a different conclusion, it may be properly observed that Mr. Justice McLean and Mr. Justice Nelson concurred in the opinion of the chief justice without expressing the slightest dissent; and that one certainly, and the other most probably, held, and had expressed such opinions upon this particular question as required this construction to be put upon the language of the chief justice before it could have had their assent.
As it may still be insisted that there is some slight doubt whether the chief justice intended to declare that the facts showing that the prisoner was held under the *303 authority of the United States must, if denied, be proved— as well as actually exist and be returned—before the State court or judge can be ousted of his jurisdiction, or whether he intended to be understood that a mere return of such facts by the proper officer without proof, if such facts really existed, was sufficient to terminate the State jurisdiction; and as it is possible, though not at all probable, that the latter supposition is correct, and that he had not sufficiently considered the consequences of the adoption of such doctrines, the matter will be considered in that possible aspect of the case, and in view of such consequences and also in view of the consequences of disregarding the decision of the State court or judge in case he erroneously decides to discharge the prisoner after all the facts are before him.
In the cases before the chief justice there could be neither difficulty nor doubt as to the duty of the Wisconsin court, even if it had jurisdiction, or in regard to the legal right to detain the prisoner. The Supreme Court of the United States, and every Supreme or Superior Court of a State which had previously considered the question, had decided that the act of Congress under which the prisoner was held was constitutional; and there was the very highest degree of moral certainty that the Supreme Court of the United States would, whenever the question was presented, affirm the previous decisions. And there could be no difficulty in the future in making proper proof of the marshal’s authority; indeed, the facts upon which that authority rested were not denied in the State court, and the statutes of their own State especially require them to remand the prisonei1. In such cases, a marshal might, perhaps, not hesitate to stand upon his warrant and repel force by force, and to rely upon this opinion of the chief justice as his justification, even after the State court had decided against his clearly proved authority.
But suppose a different case, one depending on ques *304 tions of great difficulty, upon which the opinions of the ablest lawyers and of courts of the highest authority were known to differ, and where there was a probability that on a future occasion the marshal or other officer might be unable to procure the witnesses necessary to make proof of the facts.
In such cases the State authorities would be compelled to decide at their peril whether they would enforce the decision of their own tribunal, and the marshal or other United States officer would be compelled to decide at his peril whether to hold or discharge the prisoner. As each might call for and obtain assistance, a serious conflict, if not a conflict of organized and armed forces might ensue. But the marshal would also be compelled to decide for "himself, at his peril, in respect to his civil or criminal liability. If he hold Ms prisoner, and be sued for such imprisonment, and if the highest court of the State decide against him, he will be mulcted in damages, unless the Supreme court of the United States, on writ of error, shall reverse that decision. And, in this State, if he hold him with intent to cause him to be sent out of the State, against Ms will, he will be liable, under our statute, to imprisonment in a State prison not exceeding ten years. (Vol. 2, 4th ed. N. Y. Rev. Stat., p. 857.) If the Supreme Court of the United States reverse the decision of the State courts, the judgment against him is avoided and the detention of his prisoner justified. But if the Supreme Court of the United States decide against Mm, he must pay the damages or suffer the punishment awarded, although Ms intentions may have been pure and Ms only fault a mere error in judgment.
If the marshal, on the contrary, should discharge Ms prisoner improperly, in consequence of the opimon of the State court or judge, he may in some cases render himself liable in damages to the Umted States, or other party interested, in the detention of his prisoner.
*305 It is evident that the doctrines of Chief Justice Taney must, under any construction of his opinion, sometimes lead the officers of the United States into difficulty and produce a serious conflict between the authorities of the several States and those of the United States; but this conflict, in case of a difference of opiniou between the judicial and other authorities of the United States and of those of the States, in respect to the character and extent of their constitutional authority, may, perhaps, necessarily result from “ the complex character of our government, and the existence of the two distinct and separate sovereignties [or rather governments] within the same territorial space, each of them restricted in its powers and each within its sphere of action prescribed by the Constitution of the United States, independent of the other;” as well as from that imperfection of language which renders it impossible to define, with certainty and precision, by the brief and general provisions of a written Constitution, the line of division between the dominion and jurisdiction of the two governments. Nevertheless, it would seem to be safe to assume that the Supreme Court of the United States will, if practicable, so shape their decisions as to secure the proper disposition of such questions in the peaceable and legal mode of judicial proceedings, and thus avoid all such conflicts of force whenever it is possible to do so; and will therefore require that full proof of the authority to detain his prisoner shall be made by the United States officer before the State court or judge, so that there can be no conflict of physical forces, except when the State judiciary (as in the Wisconsin case) wrongfully assumes to review and reverse the judicial decisions of the United States courts and judges, in cases where they have exclusive jurisdiction. In such cases the chief justice holds that a United States marshal would be bound to obey the process of the United States Court, and to disregard the order of the State judge, and Congress has made provi *306 sion for the protection of the marshal and his officers in such cases.
In such cases the marshall would stand upon the supposed paramount authority of the United States, and rely upon its protection; and, as the adjudications of the State and United States tribunals are in direct conflict, and both cannot be carried out, it is perhaps a necessity that the marshal shall decide at his peril which of the two he is to obey; and, if he supposes that he is supported by the authority of the United States, he will stand upon that, as the paramount authority.
But it is not in such cases only that United States officers, as well as State officers, are necessarily called upon to decide at their peril questions of law or fact upon which their official action should depend. A sheriff or a marshal has an execution against the goods of A, and is urged to take and sell, under that execution, goods claimed by B as his own property. He must decide the question of ownership at his peril; for, if he take the goods of B under his execution, he is liable to respond in damages, or if he return his execution nulla bona, when he might have taken the defendant’s goods and satisfied the execution, he will be liable for his neglect.
Again, it is well settled that goods or persons actually m custody of a sheriff or marshal under the lawful process of the courts of a State, or of the Federal courts, cannot be taken out of that custody by an officer of the other government in virtue of process issued by its courts. (Hagan v. Lucas, 10 Peters’. Rep., 400; Norris v. Newton, 5 McLean’s Rep., 92; Taylor v. Caryl, 20 Howard’s Rep., 583.) But the party interested in the process in the hands "of the second officer may suppose and-allege that such pretended process is forged or void for want of jurisdiction, or other cause; and may furnish prima facie proof of the truth of such allegation. The second officer may act upon such supposition, but he does so at his peril, and *307 is liable to an action if he cannot maintain the truth of the allegations.
But is unnecessary to go out of the record and suppose cases for further illustration, for the one now under consideration is perfectly adapted to my present purpose. The officer, in this case, arrested and held the petitioner as a deserter, at his peril; and, if the petitioner has never been in the land or naval forces of the United States, even the conviction and sentence of the petitioner by a general court-martial would not relieve the officer from liability for all the damages sustained by the petitioner, in consequence of’ his illegal arrest and imprisonment. (Wise v. Withers, 3 Cranch, 331; Smith v. Shaw, 12 Johnson's Rep., 257.)
But it has lately been claimed in' other cases, as it was claimed in this, that under the case of Ableman v. Booth a State court has no authority to inquire into the truth of the facts alleged in a return to a writ of habeas corpus, or to decide upon their legal effect; in other words, that a State court has no jurisdiction to inquire whether a person claimed and held as a soldier has ever enlisted—or, if he have enlisted, whether he is an infant, and his enlistment therefore illegal and void—if the return sets forth that he is legally in custody under the authority of the United States. In short, it has been claimed that a return, whether true or false, showing that the prisoner is held under color of the authority of the United States, per se, and at once, deprives a State court or judge of jurisdiction.
Although this conclusion appears to have been acted upon, by different judges, in some late cases, it is believed that it has been sufficiently shown that this extraordinary claim cannot be maintained. Taking the language of Chief Justice Taney in its worst sense, it certainly requires not only a return of the process, or other facts showing that the prisoner is held under the authority of the United States, but also the actual existence of such facts, process or *308 authority, and that the State court or judge should be judicially apprised of their existence before the jurisdiction of the State court or judge is at an end; and the whole opinion proceeds upon the ground that the prisoner is either proved to be, or actually is, within the dominion and jurisdiction of the United States to the exclusion of the State jurisdiction; which he cannot be unless held under the laws of the United States. And it is strange that it should ever have been supposed, in the absence of the clearest and most decisive evidence forcing that conclusion, that the Supreme Court of the United States had held that in a case involving the liberty of the citizen, a State court or judge must stop short in the midst of a solemn judicial proceeding whenever any officer of the United States, or any other person, might falsely return to- a writ of habeas corpus a state of facts showing that he holds his prisoner under color of the authority of the United States?
It may be well to consider for a moment the consequences of the extreme doctrines of the judges who have denied their own jurisdiction and refused to inquire in regard to the truth of a return, or the fact, or the validity, of an enlistment, in cases somewhat like the present. If these doctrines are to be maintained, they are to be maintained in cases where only the interests of individuals are concerned, as well as in the cases in which it is assumed that the interests of the General Government, or of the War Department, are involved.
An individual may be arrested upon a forged warrant, or capias ad satisfaciendum, purporting to have been issued by a United States officer or court, or under the pretense of a warrant for his extradition to Canada-—or as an' alleged deserter, when he has never been,a soldier. The arrest may be made at Ogdensburgh or Plattsburgh, and no United States judge having jurisdiction may be within four hundred miles of the place of his arrest, whilst a judge of the Supreme Court of the State is, perhaps, *309 within a stone’s throw. Must his counsel go to Buffalo or Cooperstown for a habeas corpus, or can he have one from a State judge, and there at once establish the forgery or prove the fact that there is no warrant for his extradition, or that he has never been in the military service?
Let us suppose that- before the repeal of the Fugitive Slave Act a free negro had been arrested and claimed as a slave, and was being carried out of the State under the alleged right of a master to arrest his slave without process, or under a forged certificate purporting to be signed by a United States judge or commissioner. Would a State judge, upon a return setting up that he was a slave and legally held as such; or that he had been arrested as a slave and was legally held under such a certificate, and the laws and authority of the United States declare that the return, notwithstanding its allegations were traversed and denied, was sufficient to oust him of his jurisdiction, on habeas corpus; or would the alleged fugitive he permitted to allege the forgery in his traverse to the return in the one case, or the fact that he was born in this State and was free, in the other, and then prove the facts on the hearing, and thus obtain his discharge?
In further considering the question under discussion, it may be well to inquire still further into the practical operation of the principle and practice contended for by those who deny the right of the State judge or court to inquire into the truth and the legal effect of the allegations made in the returns of a military officer.
If this principle- and this practice are to prevail in the State courts, they must, for the same reasons, be adopted in the courts of the United States; for those courts are .as scrupulously careful not to intrude upon the exclusive dominion of the State authorities as the latter can properly he to abstain from intruding upon the dominion and denying the authority of the United. States. (Hagan v. Lucas, 10 Peters’ Rep., 400; Taylor v. Caryl, 20 Howard’s *310 Rep., 583; Freeman v. How, 24 Howard, 451; Norris v. Newton, 5 McLean’s Rep., 92.)
If, therefore, a mere assertion, without proof, of a right to hold a prisoner in custody under the authority of the United States, or the mere naked return of an officer or other person alleging facts from which such authority must be legally inferred, ousts a State court of all jurisdiction to inquire into the truth of the assertion, and to discharge the prisoner if no such authority exists, then, by parity of reasoning, a mere assertion, without proof, of similar facts in regard to a prisoner claimed to be in custody under the authority of the State, would, in the same manner, oust a United States court of all jurisdiction to inquire on habeas corpus into the legality of the imprisonment. Thus all the facts necessary to the complete denial of the privilege of the writ of habeas corpus, and the perpetual incarceration of the prisoner, would be the making of a false return, suited to the occasion, whenever the legality of the imprisonment was assailed in the courts of the State or in those of the United States. The prisoner might apply first in the State court, then in the United States court, then in the State court again, and so on indefinitely; and counsel might be kept flying, like a shuttlecock, between two courts, in consequence of being thus beaten, alternately, by the one and by the other.
That such a state of things cannot legally exist, and ought not to have the deliberate sanction of the courts of the United States, or of the States, has been, it is believed, sufficiently shown.
■ The authority of the decisions of State courts and .judges in support of their jurisdiction is absolutely irresistible and overwhelming, and if any doubt can be entertained. of the correctness of the .proposition that the opinions of Chief Justice Taney and of Justices Nelson and McLean must be considered, as affirming that the fact that the prisoner is legally held under the authority of the United *311 States must not only be alleged but proved, in order to oust the jurisdiction of a State court or-judge in a habeas corpus case, there can certainly be no doubt that all those judges require, not merely the allegation or return of facts showing such authority, but also their actual existence; the actual truth of the return, and not the mere formal but false assertion of a state of facts that does not exist.
Even under this latter construction of these opinions, the State court or judge, if authorized by the State law to entertain proceedings upon habeas corpus, should certainly proceed and order the discharge of the party, unless the facts alleged are proved or admitted—leaving the party holding the prisoner to retain or discharge him, at his peril, upon the ground that he is actually authorized to hold him under the laws of the United States, although not able to prove the facts in the proceeding before the State court or judge. ¡No other course, it is submitted, can be consistent with the' authority or the dignity of the State, the duty of the judge, or the rights of the citizen. It is the right of the citizen to be discharged, and the duty of his State to enforce that right, unless his imprisonment be lawful; and it is obviously the duty of a judge, in legal proceedings prosecuted before him, to act upon legal proof alone, and not upon the mere assertion of a party. Indeed, the Revised- Statutes of ¡New York, and the statutes of other States, expressly require the discharge of the prisoner “if no legal cause be shown for his imprisonment or restraint” (2 Rev. Stat., p. 567, sec. 39); and they clearly require the State court or judge to exercise plenary jurisdiction except in the cases specified in sec. 40.
Upon the'most careful and deliberate consideration of the authorities that I have been able to give, I am of the opinion that the jurisdiction of State courts and judges, in cases like this, and in cases of persons detained by United States officers under color of illegal enlistments, or *312 other pretense of authority derived from the United States, where no such authority exists, is well and properly established by an irresistible preponderance of authority; and that State courts and judges may properly say, as was said by the Supreme Court of ¡New Hampshire, in The State v. Dimmick (12 N. H. Rep., 197): “If the laws of the
United States justify the detention of the applicant, there is nothing illegal. If they do not, it is .not a case arising under the laws of the United States, although it may be under color or pretense of those laws. But a mere pretense of authority under the laws of the United States is no better than any other pretense. It neither confers an exclusive jurisdiction on the courts of the United States, nor ousts the ordinary jurisdiction of the courts of this State, hi or can it make any difference that the illegal imprisonment, if there be one, is by an officer of the United States army. The courts of the United States have no exclusive jurisdiction over their officers.”
It was further urged in the brief before referred to, that that the decision of Judge Lamont was a bar to the proceeding in this court, although he had no jurisdiction; and that the petitioner having been produced before that officer and been remanded, was estopped from taking advantage of the want of jurisdiction to the prejudice of the . government; but the conclusion I have reached upon the question of jurisdiction renders it unnecessary that I should, consider whether, under the well-known rule that consent cannot confer jurisdiction, there is anything in the proceedings before Judge. Lamont which should give to proceedings without jurisdiction the effect which is given to proceedings where the jurisdiction is not questioned; for certainly the petitioner cannot be estopped by such proceedings when the officer had no jurisdiction, if like proceedings are no bar when had in a court of competent jurisdiction.
Whether the proceedings before Judge Lamont (his *313 jurisdiction being established) are a bar to the writ prosecuted here, will now be considered.
That there have been several decisions in courts of different States declaring that a prior decision under a previous writ of habeas corpus is conclusive, while the- question remains the same, is well known; but some, if not most of them, have proceeded upon the ground that by the laws of the State the first decision could have been reviewed by writ of error. No such review of the decision of a judge of this court or of any court or judge of the United States is allowed under the laws of Congress, in a case like that before Judge Lamont, and a prior decision by a Circuit Court of the United States in such a case is no bar to a second hearing upon the merits before a single judge of the same court or other proper officer. (In re. Kaine, 3 Blatchford’s Circuit Court Rep., 1.) If a decision of the Circuit Court would be no bar, it would seem that the decision of Judge Lamont should have no greater effect, even though by the law of the State a writ of error might have been prosecuted upon his decision.
The case of Kaine (ubi supra) could not have had a more thorough examination or a more deliberate consideration. It had been before the Circuit Court and Supreme Court of the United States before the final decision by Mr. Justice Nelson; and no better guide than the decision of that learned jurist, made under such circumstances, need be desired. As the case is decisive of the question, and as Judge Nelson in his opinion discusses the case of Mercein v. The People, which was relied on here by the respondent's counsel, I extract from the opinion so much as relates to this question:
“The learned counsel appearing on behalf of the British authorities has objected that the decision of Judge Betts, sitting in the Circuit Court, upon the return to the writ of habeas corpus before that court, it being a court of competent jurisdiction to hear and determine the question *314 whether the commitment under the commissioner’s order or warrant was legal or not, is conclusive, and a bar to any subsequent inquiry into the same matters by virtue of this writ. I do not so understand the law. The learned counsel has referred to Mercein v. The People (25 Wend., 64) as an authority. The question in that case arose under the statute of the State of Hew York regulating the proceedings upon the writ of habeas corpus, and, if the decision there is as supposed, it would not be an authority to govern this case. The question there, however, which arose upon the proceedings of a father to obtain the possession of an infant child from the custody and care of the mother, who had separated from her husband, is not analagous. But the conclusive answer to this objection is, that the proceedings upon this writ in the Federal courts are not governed by the laws and regulations of the States on the subject, but. by the common law of England, as it stood at the adoption of the Constitution, subject to such alterations as Congress may see fit to prescribe (Ex parte Watkins, 3 Peters, 193; ex parte Randolph, 2 Brock C. C. R., 447); that according to that system of laws, so guarded is it in favor of the liberty of the subject, the decision of one court or magistrate upon the return to the writ, refusing to discharge the prisoner, is no bar to the issuing of a second or third or more writs, by any other court or magistrate having jurisdiction of the case; and that such court or magistrate may remand or discharge the prisoner, in the exercise of an independent judgment upon the 'same matters. (Ex parte Partington, 13 Mees and W, 679; Canadian Prisoner’s case, 5 id., 32, 47; The King v. Suddis, 1 East, 306, 314; Burden. Abbott, 14 id., 91; Leonard Watson’s case, 9 Ad. and Ell., 731.) In one of the cases referred to the prisoner had obtained this writ from two of the highest common law courts of England, and also from the Chief Justice of the King’s Bench at Chambers, in succession, *315 and their judgments had been given upon the cause of his imprisonment; and the learned judge, in delivering his opinion on the last application, alluding to the decisions on the former writs refusing to discharge, observed that this was no objection to the hearing on that occasion, as a subject in confinement had a right to call upon every court or magistrate in the kingdom, having jurisdiction of the matter, to inquire into the cause of his being restrained of his liberty. The decision, therefore, of the Circuit Court, upon a previous writ of habeas corpus obtained on behalf of the prisoner, refusing to discharge him, will not relieve me from inquiring into the legality of the imprisonment under the order of the commissioner, upon the present application.”
In addition to this decision of Mr. Justice Nelson, I . may cite the cases of The State v. Brearly (2 Southard's Rep., 555); Com. v. Fox (7 Barr's Penn. Rep., 336); Maria v. Kirby (12 B. Monroe, 550), and ex paite Alexander (2 Amer. Law Reg., 44); and I am inclined to think that even in States where a prior adjudication under a writ of habeas corpus is held to be a bar to a subsequent proceeding, the decision of the court of another State, or of a court acting under a different legislative jurisdiction, would not be considered a bar to such proceeding. (The State v. Brearly, ubi supra.) But Name’s case alone is sufficient to show that the prior adjudication of Judge Lamont cannot be considered a legal bar to proceedings ill this court.
But it is insisted that when the return to a writ of habeas corpus alleges that the prisoner- is held to answer for the crime of desertion, of which the military courts of the United States have exclusive jurisdiction, courts of civil jurisdiction cannot inquire into the fact of his enlistment, but must remand him for trial by the court which has jurisdiction of the offense charged. This makes it necessary to inquire what foundation there is for the claim thus *316 made; and, also, what is the main question now before this court for determination.
After what I have said, and the citation of cases I have ' made, I shall not stop to inquire whether a return that the prisoner is held as a soldier and deserter, without any proof of the fact of his being actually held as such deserter, requires the petitioner to be remanded. It is the proof of the fact, not of desertion, but of the actual holding for trial on that charge, and that the party is subject to the jurisdiction of the military tribunal, which requires the civil court to remand the prisoner. In the case of Com. v. Fox (7 Barr's Penn. Rep., 336), cited by the counsel in support of his position, the petitioner was discharged by the Supreme Court of .Pennsylvania, by reason of the invalidity of his enlistment, although it appears from the report of the case that he had enlisted and deserted and then surrendered himself, and had also been brought before the Court of Common Pleas under a previous writ of habeas corpus, and had been remanded. In Com. v. Cushing (11 Mass. Rep., 67), a prisoner who had enlisted, had deserted and had then been brought before a general court martial and there admitted his guilt, and who was then actually in custody under the proceedings or sentence of the military court, was discharged by the Supreme Court of Massachusetts on the ground that, being a minor, his enlistment was void. And, unless my memory is at fault, I have seen the report of another case, in which the same court discharged a minor on like grounds, although he. was then undergoing the sentence of a court martial upon his conviction of the military offense of mutiny committed while he was actually in service.
I have not, however, heretofore followed these decisions, and have, in repeated instances, refused to grant a writ of habeas corpus when it appeared by the petition that the minor, although his enlistment was not binding, had in fact *317 been in the military service, had actually left such service, and was held for trial as a deserter.
In such cases I felt justified in following the doctrines of the case of Wilber v. Grace (12 Johnson’s Rep., 68), and Com. v. Gamble (11 Sergt. & Rawle, 93), although the last named case was not followed by the court in Com. v. Fox (7 Barr, 336); and for the reasons that, under the fifth article of the amendments to the Constitution of the United States, such a case may be properly held to be one “ arising in- the land or naval forces” of the United States, and the party be considered as within the jurisdiction of the military tribunals in consequence of his actually being in the army, although under a void or voidable enlistment. As was said by Chief Justice Gibson, in Com. v. Gamble, there would be an end of all safety if a minor could insinuate himself into an army, and, after having perhaps jeopardized its very existence by betraying its secrets to the enemy, escape military punishment by claiming the privilege of infancy.”
But this case is not one in which the doctrines of Com. v. Gamble and. Wilber v. Grace will aid the respondent. If the proof shows that the petitioner was ever in the military service, it establishes just as satisfactorily that he was legally enlisted—the case in regard to the qúestion of , his actual enlistment or entry into the military service, or his ever having been within the jurisdiction of the military authorities, depending entirely.upon the credit to be given to the witness Biley. But the question of credibility will not be considered until after some other questions have been disposed of, one of which may properly be considered in connection with the point now under consideration.
It was insisted, upon the final argument, by the learned attorney of the United States, that it had been shown that proceedings were pending before a competent military court, having 'jurisdiction of the offense of desertion, and *318 in which t'hé matters here in issue might be tried; and that this court should, therefore, remand the prisoner and allow the question of jurisdiction to be tried and determine d by the military court. As this point involves a question of fact as well as of law, I will first refer to the evidence bearing upon the proposition.
That the petitioner was arrested on or about the 17th of February last, under an allegation that he was a deserter, was not -denied. A formal charge, alleging his desertion, and bearing date February 20, 1867, was produced at the hearing; but there was no proof of its existence prior to the 8th of May, when it was first seen by the lieutenant having the general charge of the law business at headquarters of general recruiting service, where said charges and specifications bear date; and it appears that on that day they were forwarded by General Butterfield, in command at such headquarters, to the commanding general of the department of the east, with a request that they should be returned if the order for the trial of the party was granted. It also appears by the indorsement thereon, dated “Dep’t of East, May 11, 1867,” that private Sloan was directed to be tried by the general court-martial then in session in Hew York city, “ provided that the witnesses required are or will be in this department.”
There was no proof of the order under which such . court-martial was organized, or that it was ordered before the month of May; and there is little difficulty in reaching the conclusion that this general court-martial would have had no jurisdiction of the person of the petitioner, or authority to try him upon the charge referred to, prior to the 11th May, 1867, when the order of the general commanding the department of the east was made, even if he had been a regularly enlisted soldier of the army; or, in other words, until nearly two months after this court took jurisdiction. But I do not regard this as material, for the reason that the question is not one of courtesy, or of pri *319 ority of jurisdiction, but whether the military tribunal has or can have any jurisdiction over the person of the petitioner.
That this court has no jurisdiction of the military offense of desertion, is a proposition which cannot be disputed, and it is equally clear that a general court-martial has nó jurisdiction to try a citizen who has never belonged to or been connected with the military service, for desertion or any other offense. (Arts. 5 and 6, Amdts. Const. U. S.; Wise v. Withers, 3 Cranch's Rep., 331; Smith v. Shaw, 12 John. Rep., 257; Isham Henderson’s Case before Judge Ballard, U. S. Dist. Judge in the Kentucky District in 1866; and see Duffield v. Smith, 3 Sergt. and Rawle, 590; Wilson v. Mackenzie, 7 Hill’s Rep., 95; (¡hunt v. Gould, 2 Henry Blackstone’s Rep., 69; Brooks v. Adams, 11 PicJcering's Rep., 442; Warden v. Bailey, 4 Taunton’s Rep., 67; Com. v. Blodgett, 12 Metcalf’s Rep., 56.)
The question of the guilt or innocence of the petitioner is not therefore to be considered here, and the case must turn upon the question whether he was a soldier in the army (for there is no pretense that he was otherwise in or connected with it), and was therefore subject to the jurisdiction or control of the military authorities. If this question can be answered in the affirmative, he must be remanded, even if he be ready to produce the most conclusive proof of his innocence of the crime of desertion; if it must be answered in the negative, it is my imperative duty to discharge him.
The evidence bearing upon this question of fact has been deliberately considered, and I cannot doubt that it is my duty to discharge the prisoner, believing, as I do, that the' testimony of Eiley in regard to the petitioner's enlistment in and connection with the army is entirely false.
The evidence first offered upon the main question in this case—that of the petitioner’s alleged enlistment in the army—was the affidavit of Eiley before alluded to. This *320 evidence was objected to, but received, subject to the objection. The affidavit was entirely extra-judicial, and no indictment for perjury could be sustained upon it; and, therefore, it is of itself inadmissible as evidence against the petitioner. But Biley was subsequently placed upon the stand, and referred to the affidavit as made by him, and it will therefore be referred to in the consideration of his testimony.
A descriptive list was also offered in evidence, and objected to by the petitioner’s counsel; and, though greatly doubting’ its admissibility as evidence, it' was received and will be considered. This list- contains the name of William Sloan, stating his enlistment at Detroit, Michigan, March 28, 1865, by Capt. Hart; and describing the recruit as twenty-five years of age, five feet five inches high, with blue eyes, brown hair, and fair complexion. It also states Sloan’s desertion at Jeffersonville, Indiana April 20, 1865.
Certified copies of the enlistment papers of a recruit, in the name of William Sloan, were also produced, in which enlistment papers the same description of the recruit was given. The contract of enlistment was signed with a mark, and it was followed by the usual certificate of Capt. Hart, as enlisting officer, that he had inspected the recruit, and to his description as above stated; and by the usual certificate of J. Saunders, as acting assistant surgeon, stating his official examination of the recruit.
Biley was then called and sworn as a witness, and stated in substance, among other things, that on the 28th March, 1865, he was in Detroit, in the employ of Goodrich, a recruiting broker, and saw the petitioner, Beynolds, in Goodrich’s office on that day, and that he (Beynolds) was enlisting in the regular army; that he saw him give the name of the place he hailed from as some place in Canada; that he had known Beynolds before, in Niagara county, where he then lived, close by where he (Biley) lived; that *321 he could not say that he saw him sign any paper there or whether he did or not; that he forgot the name of the examining surgeon; that he saw Reynolds receive money at that time, and that he got $375 or $400, and asked him to take charge of it and give it to his wife, and that he did so; that Reynolds gave him, bethought, $365; and that he gave Reynolds’ wife $335; that he next saw Reynolds three or four days after the 28th of March, in the Fort at Detroit, or about two miles out of the city; that Reynolds was then doing nothing, biit was dressed in soldier’s clothes, and he thought in infantry uniform; that John McCarthy and Henry Gardiner went to the fort with him at that time and attempted to go in, but were objected to; that they got in a rod or two and were turned out; that this was the first and only time he saw Reynolds at the fort, and and that he could not say that the other two persons saw him; that he next saw Reynolds about twenty or forty days after, at Lockport, and in citizen’s clothes; that Reynolds enlisted under the name of William Sloan, and that he heard Mm say, when they asked him what his name was, that it was William. Sloan; that he made an affidavit in this matter, and that the signature to the affidavit shown him is his.
On Ms cross-examination he testifies that he had been at Detroit some days before the 28th March, and that he remained there two or three days after that time. On being asked if he recollected any one who went with him to Detroit at. that time, he declined, to answer, and, after being cautioned by me and Ms rights explained to Mm, he further testified that he could not answer the question without criminating Mmself in respect to a criminal offense committed before he was called upon the stand; that at and during the time he was at Detroit as aforesaid, there were there from Lockport, Henry Gardiner, John McCarthy, John Crane, John Donnelly, Patrick Collins and Thomas Mason; that he could not give any more names if he did *322 recollect them; that he declined to give any other because it would, in his opinion, criminate himself; that he saw Reynolds on the sidewalk before he went to Goodrich’s office, and went to the office with him; that it was sometime in the forenoon; that Goodrich asked Reynolds if he wanted to enlist, and then said he would draw up his enlistment papers; that he had forgotten all about the bargain for the money; that Goodrich told his partner to go into the room and draw up the papers, and they went for the doctor, who came and stayed about ten minutes; that Goodrich told him the doctor did not want to take the man‘ that he (the witness) did not go into the private room; that he heard it said, in Reynolds’ presence, that he wouldn’t pass; that Goodrich said so, but said, wait a little and he would see if he couldn’t get him through; that they said they objected to him on account of his eyes; that Goodrich went into the private room again and came out and said if Reynolds would throw off $20 he could get him to pass; that Reynolds said he would, and went into the private room; that Goodrich came out and said he had passed, and they then finished drawing up the papers; that after the papers were drawn up Reynolds went away and he (Riley) staid in the office; that he next saw Reynolds at the fort as before stated; that the fort was a stone and brick and earthen works fort; that on that occasion he saw Reynolds sitting down three or four rods from him and with his face towards him, and that he did not think Gardiner and McCarthy went as far into the fort as he did. On being asked how many men he took to Detroit to be put in under false names, he objected to the question, and said he could not answer it without criminating himself. On being asked if he enlisted in the army, he objected to it, and said he could not answer it without criminating himself. On being asked if he enlisted under a false name, he objected to that question. He also testified that he thought Goodrich was then in Detroit; that he (Riley) and his brother were indicted for *323 stabbing Reynolds; that Reynolds was a witness on the trial of the indictment against his brother, and that he made the affidavit against Reynolds about seven days after the trial; that he had been indicted for stealing sheep and for stealing steers; that he was drafted and relieved from the draft, and that he had been convicted of stealing property to the value of more than $25. Other questions were put to him which he declined to answer, because to do so would criminate him; and he denied having made sundry statements in regard to the reasons why he made the affidavit against Reynolds; sundry declarations which tended to show malicious and revengeful feelings against Reynolds; and a statement that he must have been in one of his crazy fits when he made the affidavit—which were subsequently fully proved by other witnesses.
Henry Gardner, the person that Riley alleged went into the fort at Detroit, at the time he said he saw Reynolds there, was then called, and testified that he knew Reynolds by sight, and went to the fort with Riley; but nothing happened there that he saw; and that he did not then know Reynolds.
Neither Capt. Hart, Surgeon Saunders, Goodrich, the recruiting agent, or his partner, nor any other person, was called to identify the petitioner, or to show that he had ever enlisted, or had ever been in the military service as charged; and the respondent rested, reserving the right to call Capt. Hart, if he arrived before the testimony was closed, and also reserving the right to call Patrick O. Melay, a convict in the penitentiary at Buffalo, for whom a writ of habeas corpus ad testificandum had been issued, on the application of the attorney of the United States.
The petitioner then called Dr. Kittinger, who testified that he had been for three and a half years a surgeon in the army,, and in the habit of examining recruits; that he had measured the petitioner, and that his height was five' feet seven inches, as they measured recruits for the army; *324 that he had known Reynolds for ten years, and that his hair had always been black since he knew him, as it then was. This witness, and several other respectable witnesses, testified that the reputation of Riley was bad; and most of them added that they would not- believe him under oath; while the character of Reynolds was proved to be good—one witness only saying that he heard him and others named in general terms as bounty jumpers, and the others declaring it good without exception.
It was also proved by one.witness, who fixed the date by his entry in his account book, that Reynolds was at his shop in Lockport, and then paid him for a pair of boots on the 28th of March, 1865. Another witness proved that Reynolds'and his wife were together at his store, and bought a stove of him about the last of March, and he then stated other facts and circumstances, and entries appearing upon his books, showing that it was almost certain that it was on the 27th of March; and that on the same 27th of March he sold a stove to Peter Mnnigan or his wife,- and charged it on his book as then exhibited in court. It was also proved by Mrs. Finnegan that she - bought a stove as stated, and that she on that day saw Reynolds and his wife at the store where the stove was bought; that she talked with Mrs. Reynolds then, and that Reynolds and his wife were there buying a stove. It was also proved by the brother-in-law of Reynolds that he was present when the old stove of Reynolds was broken, and knew of the purchase of the new stove by Reynolds and wife; that he furnished a part of the price, and went with them to" one store to make the purchase, but left them before they went to the store where it was purchased; that he saw the new stove at Reynolds' house the next day, „ and then saw and talked with Reynolds; that he knew this was the last of March, and thought it was some eight or " ten clays after St. Patrick's day, which was the 17th. This wiinosH and his father also testified that during the months *325 of March and April they were frequently at Eeynolds’ house, and saw him at church on Sunday, and did not know of his being absent from home. It was proved by another witness that Eeynolds boúght feed of him on the 17th or 18th of April, 1865, at Lockport. The witness who had been brought from Buffalo by habeas corpus was not called by the respondent, and no other witness was called who in any manner sustained or corroborated the testimony of Eiley, or declared that his general character was good.
In his affidavit before referred to, Eiley had sworn that he “ Jcnew Eeynolds enlisted in the regular army of the United States for the term of five years, and that on the same or the next day after he enlisted, he saw him with the United States uniform on, and in charge of Sergeant Baldwin, who claimed to be recruiting for the regular army.” His testimony here shows no personal knowledge of such enlistment, but tends to prove it by circumstances rather than by any statement of his enlistment in the presence or within the personal knowledge of Eiley;- and his testimony here in respect to his subsequently seeing Eeynolds in uniform is not only silent in respect to his being in charge of Sergeant Baldwin, but is inconsistent with the idea of his being in Baldwin’s personal charge. • In his affidavit he says he saw Eeynolds in the fort the same day or the next day after he enlisted, and here he says it was three or four days after; but this last discrepancy would be of no importance if there were not other strong grounds for discrediting his testimony.
It is- perhaps impossible, now, to say what my conclusions would have been if the case stood upon this evidence alone, and the evidence afforded by the inspection of the petitioner in respect to his age, (and from which I should say he was at least 35 years of age,) but I am strongly inclined to the opinion that I should have held, upon this evidence alone, that the petitioner ought to be discharged.
*326 But the petitioner himself was sworn as a witness, and directly and positively contradicted Riley in respect to everything which related to his alleged enlistment, or being in uniform, or in the military service; and I have no doubt that he testified to the truth. He also testified •> that he was thirty-eight years of age last October.
The competency of this witness was objected to, but it was insisted that he was competent under the provisions of section 399 of the Hew York Code, as amended prior to and in 1867. To this it was replied that these provisions that “ a party to an action or special proceeding in any and all courts, and before any and all officers and persons acting judicially, may be examined as a witness on his own behalf,” were not applicable to a proceeding on habeas corpus, by reason of the restrictions imposed by the 47lst section of the Code as originally adopted. There may be, possibly, some doubt of the competency of the party under these provisions, but I think there can be no doubt of the actual legislative intention to extend the provision allowing parties to be witnesses to proceedings on habeas corpus, except in criminal cases; the only doubt, if any, being whether they have given legal expression to that intention. The only direct decision of a State court or judge upon this question, which has fallen under my observation, is that of Judge Lamont, made when this petitioner was before him on habeas corpus. Judge Lamont (as appears by the proceedings put in evidence here) then declared in his decision that “ Reynolds himself is a competent witness;” and he based his decision against granting a discharge mainly on the ground that Reynolds had not offered himself as a witness, and thus disproved by the best evidence in his power what had been alleged and sworn to against-him. This opinion of Judge Lamont in favor of the competency of the party in this case, is, I think, sustained by the reasoning of Judge Hunt in delivering the opinion of the Court of Appeals in Williams v. *327 The People (33 N. Y. Rep., 688); and it will, I presume; be followed in the courts of the State.
It was objected that this was in the nature of a criminal proceeding, and that the party for that reason was not competent; but this court can entertain no question of the guilt or innocence of the prisoner, and this is not a criminal proceeding any more than a suit brought against the respondent for the wrongful arrest and illegal imprisonment of the petitioner would be a criminal prosecution. The rule of evidence here should be the same as it would be in such a prosecution.
But aside from the provisions of the New York Code the petitioner was a competent witness in this case. By an act of Congress “ making appropriations for sundry civil expenses of the government,” and for other purposes, approved July 2, 1864 (13 U. S. Stat. at Large, pp. 344-351), it is “provided that in the courts of the United States there shall be no exclusion of any witness on account of color, nor, in civil actions, because he is a party to or interested in the issue to be tried.” This is a civil action. (See Holmes v. Jennison, 14 Peters, 563, pr. Taney, C. J., concurred in by JJ. Story, McLean and Wayne; and 597, by Caton, J.) It is the legal demand of the petitioner’s right in the form prescribed by law, and no question of guilt or innocence can be entertained during its progress. The party is therefore a competent witness under the act of Congress.
If this is so, there cannot be the slightest possible doubt that the petitioner should be discharged, for the conclusion that the testimony of Biley was false is irresistible.
It is but just to myself to say, in conclusion, that I have not had access to some of the cases referred to in this opinion, and have been compelled to state them from digests or elementary works. I have, however, examined the reports of most of the cases, but, from the haste in *328 which the examination has been made, it is not unlikely that some errors have been committed in stating the facts of the case, or the points decided. I am confident, however, that these errors are not such as should seriously affect my decision upon any of the questions discussed.
The petitioner must be discharged.
Petitioner discharged.